FILED
COURT OF APPEALS
DIVISION II

2014 DEC -9 AM 10: 29

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43693-1-II |
| Respondent, | PART PUBLISHED OPINION |
| v. | |
| SERGEY FEDORUK, | |
| Appellant. | |

BJORGEN, A.C.J. — A jury found Sergey Fedoruk guilty of second degree murder for the death of Serhiy Ischenko, Fedoruk's relative by marriage. Fedoruk appeals, arguing that (1) he received ineffective assistance of counsel because his attorney failed to timely pursue a mental health defense and did not object to alleged prosecutorial misconduct; (2) the prosecutor committed flagrant and ill-intentioned misconduct in closing argument by undermining the presumption of innocence, encouraging the jury to decide the case on grounds other than reasoned evaluation of the evidence, expressing personal opinions as to Fedoruk's guilt, and presenting evidence not admitted at trial; (3) the trial court erroneously admitted incriminating statements Fedoruk made to police; and (4) the trial court erroneously refused to instruct the jury on manslaughter as an included offense.

We hold that defense counsel's failure to timely retain a mental health expert or investigate the possibility of a mental health defense amounted to deficient performance, and

Fedoruk has shown a reasonable probability that the deficient performance prejudiced him. Accordingly, we reverse Fedoruk's conviction and remand for further proceedings.

We also address the prosecutorial misconduct argument in the published portion of this opinion and the admission of Fedoruk's statements in the unpublished portion, because those issues may recur on remand. Because a party's entitlement to an included offense instruction depends on the facts of the case, and the evidence presented may well differ on remand, we do not decide whether the trial court erroneously declined to instruct the jury on manslaughter.

## FACTS

### A.    Fedoruk's History of Mental Illness

Fedoruk has a long history of serious mental illness. He suffered a head injury in a motorcycle accident at the age of 18, was diagnosed with schizophrenia, and was twice admitted to a psychiatric hospital. Doctors have prescribed numerous psychotropic and antipsychotic medications, including Haldol, but Fedoruk has a history of poor compliance with the medication regimens.

In 2002, Fedoruk's family members reported to police that he had threatened them. Responding officers took Fedoruk to the emergency room, where doctors prescribed antipsychotic medication. During a 2007 competency evaluation, doctors at Western State Hospital diagnosed Fedoruk with "[b]ipolar 1 [d]isorder, [m]ost recent [e]pisode [m]anic, with [p]sychotic features." Clerk's Papers (CP) at 39. Fedoruk underwent another mental health evaluation after the State charged him with robbery, assault, theft, and criminal trespass in 2008, and a court ultimately found Fedoruk not guilty by reason of insanity.

2

In 2010, a court found Fedoruk gravely disabled and ordered him involuntarily committed, but soon ordered him released on a less restrictive alternative. After Fedoruk violated the terms of the court order, he was again involuntarily committed. Fedoruk had stopped taking his prescribed psychiatric medications and threatened to blow up Ischenko, whom Fedoruk had accused of raping a family member. Fedoruk was again released on a less restrictive alternative in December 2010. At the time of Ischenko's death, Fedoruk lived at a house with numerous relatives, including Ischenko, and received outpatient care at a local clinic.

B.    Fedoruk's Arrest and Interrogation

Two community corrections officers (CCO) and three sheriff's deputies went to the house where Fedoruk and Ischenko lived on August 1, 2011, responding to calls from Fedoruk's family members. The family members' concerns arose out of a series of incidents in which Fedoruk engaged in increasingly strange behavior, including angry outbursts directed at Ischenko and others. The family's concerns increased over the course of the morning because no one could find Ischenko, and they made additional calls to the authorities.

When the CCOs and deputies approached the house, Fedoruk met them at the front door. Despite repeated admonitions to remain outside and keep his hands visible, Fedoruk kept putting his hands in his pockets and turning to go back into the house. The CCOs handcuffed Fedoruk, stating that it was only a safety precaution and Fedoruk was not under arrest.

After questioning Fedoruk on the porch, the CCOs and a deputy began searching the surrounding grounds. As they walked the perimeter of the property, one of Fedoruk's brothers-in-law, Richard Dzhumaniyazov, ran toward them from the direction of a small ravine behind the property, yelling, "Arrest him, arrest him. Shoot, shoot." Verbatim Report of Proceedings

3

(VRP) at 121-22. Dzhumaniyazov led the officers into the ravine, where they found Ischenko's body.

Deputy Cory Robinson then placed Fedoruk in a patrol car and read him the *Miranda*[1] advisements. When informed that anything he said could be used against him in court, Fedoruk shouted, "Court, court, court!" VRP at 192. When told he had the right to talk to a lawyer, Fedoruk asked, "Lawyer, why?" VRP at 192. After Deputy Robinson confirmed that Fedoruk understood his rights and asked if Fedoruk wished to speak, Fedoruk replied, "I don't want to talk to you." VRP at 193. Deputy Robinson then left Fedoruk alone in the car.

After Deputy Robinson returned, Fedoruk began speaking without prompting for about three or four minutes. Deputy Robinson took notes and reported Fedoruk's statement at trial as follows:

> My sister, Tatyana [Varyvoda]. I ask -- I asked my sister -- . . . What you want, a big dick or something? And he tell my sister, I want sex. I tell just this. I tell smoke dick, Tatyana. I just telling him it's not -- . . . tell just this. I tell smoke dick, Tatyana. I just telling him, it's not big deal. Christian no talk to for this for sex every time. I tell him, look, is my sister, too. And -- . . . [m]y sister very, very mad. She get bitchy and say, anybody call cops? I never touch him. I not touch him, never. I go to property of Tatyana, get goats.

VRP at 907-08.

After Deputy Robinson transported Fedoruk to the sheriff's department, Chief Civil Deputy Marc Gilchrist and Detective Sergeant Joe Reece attempted to interview Fedoruk. They did not readminister the *Miranda* advisements. Fedoruk, who remained cuffed, pointed at Detective Reece and said, "I don't want to talk to you." VRP at 243-44. Detective Reece left the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

room, but Deputy Gilchrist, who interpreted Fedoruk's statement to mean that Fedoruk was willing to speak to him, remained.

Deputy Gilchrist interviewed Fedoruk without an interpreter[2] for an hour and a half. After Fedoruk asked for an attorney, Deputy Gilchrist terminated the interview and released Fedoruk to the custody of Officer Chris Napolitano, who detained Fedoruk for community supervision violations.

After further investigation, the State charged Fedoruk with second degree murder under two alternatives: intentional murder and felony murder predicated on assault.

C.    Pretrial Proceedings

While awaiting trial, Fedoruk was initially uncooperative with jail staff, who frequently used force to restrain him. After an incident in which Fedoruk "had pretty much bitten off one of his fingers," the trial court, over Fedoruk's objection, entered an order directing jail staff to forcibly administer antipsychotic medications. VRP at 1; CP at 32-34. Once medicated, Fedoruk became "docile, respectful, pretty quiet [and did not] cause any problems." VRP at 69.

The trial court also ordered Fedoruk to undergo a competency evaluation at Western State Hospital. The psychologist who performed the evaluation recommended that Fedoruk return to face prosecution, opining that

> Fedoruk does have a major mental illness, but . . . is not currently experiencing symptoms of a mental disease or defect that would interfere with his capacity to have a factual and rational understanding of the criminal proceedings he faces or . . . with his capacity to assist counsel in his defense.

CP at 45. Fedoruk proceeded to stand trial.

---

[2] Fedoruk has limited English proficiency and had the assistance of a translator at all proceedings in the trial court.

The court held a hearing to consider the admissibility of Fedoruk's various statements under CrR 3.5, taking testimony from the law enforcement witnesses who had had contact with Fedoruk. The court ruled all of Fedoruk's statements admissible and entered written findings and conclusions. The written findings include (1) that Fedoruk "was not in custody and not in a situation akin to custodial arrest" until after officers discovered Ischenko's body and Deputy Robinson placed Fedoruk in the patrol car; (2) that, although Fedoruk initially "invoked his right to remain silent," he initiated the subsequent conversation with Deputy Robinson and "thus waived his right to remain silent"; and (3) that by saying he did not want to talk to Detective Reece, Fedoruk "cho[se] which officer to talk with" and thus "initiated the conversation" with Deputy Gilchrist. CP at 8-9.

The State moved to limit testimony concerning Fedoruk's mental illness on the ground that the defense had not disclosed any expert witness qualified to give an opinion on the subject. During the hearing, Fedoruk's counsel stated that "[t]he Defense has no intention of putting forward an affirmative defense of diminished capacity or arguing that . . . Fedoruk was incapable of forming intent at the time." VRP at 333. Defense counsel instead argued as follows:

> Our defense is . . . he didn't do it, but I need to respond to the allegations of the State. To the extent that their evidence calls into question his mental health at the time, I believe it's appropriate for the Defense to be able to argue that those considerations and concerns need to be considered by the jury in determining whether or not the State's proven, specifically, that he intended to commit the crime of murder, or whether some lesser mental state was present.

VRP at 334-35. The State then summarized the evidence it intended to present concerning Fedoruk's behavior in the period leading up to Ischenko's death as it reflected on Fedoruk's mental state. The trial court granted the State's motion in part, prohibiting testimony about

diminished capacity or mental disease or defect, and ruled that the jury would not be instructed on diminished capacity.

Five days later, on the day before jury selection began, Fedoruk's counsel moved for a 60-day continuance to pursue an affirmative defense of not guilty by reason of insanity. Defense counsel stated that, although he had contemplated a mental health defense earlier in the case, obtained some records concerning Fedoruk's mental health history, and spoken to Fedoruk's family about it, "[t]here was no evidence to support or suggest those defenses" and he had "no basis legally to pursue" them until he interviewed Fedoruk after the CrR 3.5 hearing. VRP at 397, 404. In the motion, counsel asserted that his request was timely made immediately following his first opportunity to talk with Fedoruk about the commencement of the trial with an interpreter after the CrR 3.5 hearing.

The State acknowledged that "there's a legitimate basis to raise the defense" and that, based on "what the State knows of the Defendant's mental health at the time, it's possible it would be relevant to the trial [and] could change the outcome." VRP at 401. The State nonetheless opposed the motion for continuance, arguing that Fedoruk's counsel knew the basis for the defense all along, that it "look[ed] like a stall tactic," and that a continuance would cause prejudice because the State had already scheduled witnesses to testify. VRP at 400, 402-03. The court denied the motion, finding that the defense had "failed to lay a factual foundation for the basis to continue [and] that diligence has not been shown." VRP at 406.

D.   Evidence About the Night of Ischenko's Death

One of Fedoruk's nieces, Rimma Fedoruk, testified that on the night of Ischenko's death, she awoke at around 3:00 or 4:00 a.m. to find Fedoruk in her bedroom. Fedoruk asked her if she had been raped, said that he had "had a vision," and then made a punching motion in the air and said that he was "going to take care of it because he has a lot of strength right now." VRP at 518-20, 527.

The medical examiner testified that Ischenko died from blunt force trauma, and possibly also strangulation. A crime laboratory analyst testified that the DNA (deoxyribonucleic acid) profile obtained from bloodstains on Fedoruk's clothing matched Ischenko's. DNA from numerous bloodstains at the end of the driveway also matched Ischenko's profile, as did DNA in blood obtained from under Fedoruk's fingernails.

E.   Closing Argument

The prosecutor began her closing argument by stating, "It's been a long week. You've heard from 32 witnesses from the State. Sergey Fedoruk is guilty of murder two." VRP at 1771-772. After going through the elements of the crime as charged, the prosecutor asked the jury, "What are the agreements in this case?" VRP at 1775. She then discussed the physical evidence presented in this context, repeatedly referring to matters on which the defense presented no evidence as "agreements." VRP at 1776 ("Both sides can absolutely agree . . . that" Ischenko was beaten or strangled to death); VRP at 1777 ("Agreements. Absolute agreements."); VRP at 1778 (same). The prosecutor argued that, based on these agreements, "[i]dentity is the only issue" remaining. VRP at 1779.

The prosecutor then turned to the theme of her argument: "Intuition is a powerful thing." VRP at 1784. The prosecutor repeated this intuition theme several times in the course of discussing testimony indicating that several of Fedoruk's family members immediately suspected Fedoruk of involvement in Ischenko's disappearance.

The State supplemented the argument with a PowerPoint presentation. On the first slide, under the heading "State v. Fedoruk," the words "Guilty Murder 2" appeared in large red letters. Ex. 287. The next slide showed a photo of Ischenko, alive and smiling, under the heading "Serhiy Ischenko." Ex. 287. The third shows Ischenko's naked, battered body on the autopsy table under the heading "Murder 2" in large red letters, which heading also appeared on each subsequent slide. Ex. 287.

The slides tracked the prosecutor's argument, showing various "[a]greements," slides 14-16, and the theme "Intuition is a POWERFUL thing" between a bullet point saying, "Family immediately suspects Defendant," and one saying, "Richard [Dzhumaniyazov] finds body, immediately says arrest him." Ex. 287. One slide listing various "agreements" shows a photo of Ischenko's body lying in the ravine under the heading "Murder 2." The presentation also includes sound effects and animation, such as footprints appearing across the bottom of exhibit 287, slide 27, and concentric rings of a target, corresponding to various pieces of evidence, appearing on the screen and culminating with an arrow pointing from the name "Sergey Fedoruk" to the bullseye. Ex. 287.

The prosecutor concluded the presentation by repeating the second and third slides, described above, and showing another, larger image of Ischenko's body in the ravine under the heading "Murder 2." Ex. 287. On the final slide, under an enlarged "Murder 2" heading, the

9

word "GUILTY" flashes, written with all capitals in a 96-point red font. Ex. 287. As these words and images appeared on the screen, the prosecutor delivered the following summation:

> Serhiy Ishchenko. He's a brother. He was an uncle. He was a father. He was a tidy man, a hard worker and considerate. He was beaten to death, stomped to death, strangled to death. His body was left in a ravine and he was left for dead by the Defendant. Murder two. The Defendant is guilty, guilty, guilty. Thank you.

VRP at 1810. Fedoruk did not object to any portion of the State's closing argument, or to the PowerPoint presentation.

In its closing, the defense sought to exploit the lack of direct testimony linking Fedoruk to the killing. Fedoruk's counsel also suggested that Ischenko's estranged wife or Dzhumaniyazov, the brother-in-law who first discovered Ischenko's body, may have been involved.

The State gave a brief rebuttal, concluding with "[t]he Defendant is dressed in Serhiy Ishchenko's blood. There's nothing more that you need. He's guilty." VRP at 1815. The jury returned a guilty verdict, finding by special interrogatory that Fedoruk committed intentional murder, not felony murder predicated on assault. Fedoruk timely appeals.

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

Fedoruk contends that his counsel's failure to timely investigate a mental health defense by consulting with a qualified expert deprived Fedoruk of the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution. We agree.

10

A.   Standard of Review and Controlling Law

We review claims of ineffective assistance of counsel de novo as they present mixed questions of law and fact. *State v. A.N.J.*, 168 Wn.2d 91, 109, 225 P.3d 956 (2010). A defendant who raises an ineffective assistance claim "bears the burden of showing that (1) his counsel's performance fell below an objective standard of reasonableness and, if so, (2) that counsel's poor work prejudiced him." *A.N.J.*, 168 Wn.2d at 109. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Although "[t]here is a strong presumption that defense counsel's conduct is not deficient," that presumption is rebutted if "no conceivable legitimate tactic explain[s] counsel's performance." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

B.   Deficient Performance in Failing To Investigate Fedoruk's Mental Health Defense

Because "[e]ffective assistance of counsel includes assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial," an attorney's failure to adequately investigate the merits of the State's case and possible defenses may constitute deficient performance. *A.N.J.*, 168 Wn.2d at 111 (citing *State v. S.M.*, 100 Wn. App. 401, 413, 996 P.2d 1111 (2000)). While

> [t]he degree and extent of investigation required will vary depending upon the issues and facts of each case, . . . at the very least, counsel must reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial.

*A.N.J.*, 168 Wn.2d at 111.

11

We will not generally hold deficient a defense attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690-91. Where an attorney makes strategic choices "after less than complete investigation," however, a reviewing court will consider them reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. With respect to the need for expert testimony, our Supreme Court has adopted the approach set forth by the Ninth Circuit Court of Appeals:

> "Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert."

*In re Pers. Restraint of Brett*, 142 Wn.2d 868, 881, 16 P.3d 601 (2001) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999)).

The State correctly points out that the record on appeal does not make entirely clear what investigation Fedoruk's counsel may have conducted. Counsel's statements at the hearing on the motion to continue, however, establish that the defense had not retained a mental health expert or had Fedoruk's mental condition as of the date of the crime evaluated by a qualified mental health professional. Initially, defense counsel described the basis for the continuance motion as follows: "an issue has arisen that creates a requirement . . . to pursue a defense theory *not previously pursued.*" VRP at 395 (emphasis added). Counsel further stated that "[t]here was no

evidence to support or suggest those defenses prior to" interviewing Fedoruk after the CrR 3.5 hearing, and that "we have obtained other prior history that would go in aiding an evaluation at this point." VRP at 398, 404. Under the circumstance presented here, we consider this record sufficient to warrant our review.

The extensive history of mental illness outlined above, all of which was available to the defense from the beginning of the case, indicates that the decision not to seek to retain an expert to evaluate Fedoruk until the day before jury selection fell below an objective standard of reasonableness. Even if Fedoruk told counsel that he was not involved in Ischenko's death and did not wish to pursue a mental health defense, counsel could not have assisted him in making an informed decision about the consequences of going to trial on a theory of general denial without first getting an expert opinion regarding Fedoruk's mental health at the time of the killing. In light of the State's strong circumstantial evidence against Fedoruk, the failure to obtain an independent expert evaluation appears even less reasonable.

The State relies on *In re Personal Restraint of Davis*, 152 Wn.2d 647, 721-32, 101 P.3d 1 (2004), in which our Supreme Court rejected a petitioner's claim that counsel's failure to present a mental health defense during the guilt phase of a capital murder trial deprived him of effective assistance. *Davis* is of little instruction here, however, because in that case defense counsel retained five mental health experts prior to trial. 152 Wn.2d at 723.

Similarly, the State cites *In re Personal Restraint of Elmore*, 162 Wn.2d 236, 258-59, 172 P.3d 335 (2007), which held defense counsel's decision not to present mitigating mental health evidence at sentencing reasonable. *Elmore*, however, is also of little instruction because counsel

13

in that case had retained an expert prior to trial and fully investigated the defendant's mental health situation. *Elmore*, 162 Wn.2d at 245-46, 258.

The State also relies on *Brett*. In that case, the court found a defense attorney's performance fell below the standard of reasonableness based on several deficiencies, including failure to investigate a mental health defense:

> [W]hen counsel knew or had reason to know of a mental defect or illness affecting their client in a possible death penalty case, counsel could and should have: (1) promptly sought the appointment of cocounsel; (2) presented a mitigation package to the prosecutor before a death penalty notice was filed; (3) promptly investigated relevant mental health issues; (4) sought a timely appointment of investigators; (5) sought a timely appointment of qualified mental health experts; and (6) adequately prepared for the penalty phase by having relevant mental health issues fully assessed and by retaining, if necessary, qualified mental health experts to testify accordingly.

142 Wn.2d at 882. The court specified, however, that

> [w]hile the failure to perform one of these actions alone is insufficient to establish ineffective assistance of counsel, the failure to perform the combination of these actions establishes that defense counsel's actions in Brett's trial were not reasonable under the circumstances of the case.

142 Wn.2d at 882-83 (emphasis omitted). This suggests that in *Brett*'s context the failure to investigate the mental health defense does not alone suffice to establish deficient performance.

Certain of the other deficiencies the *Brett* court identified, however, also appear to be present here. Specifically, Fedoruk's counsel also did not seek "timely appointment of qualified mental health experts," nor "adequately prepare[d] . . . by retaining, if necessary, qualified mental health experts to testify." 142 Wn.2d at 882. Other deficiencies identified by the *Brett* court have no application here because this case was not bifurcated into guilt and penalty phases.

The *Brett* court summarized the basis for its holding as follows:

14

> Counsel did not conduct a reasonable investigation into Brett's medical conditions and the possible mental effects of such severe conditions. Thus, Brett's counsel was unable to make informed decisions about how to best represent him in both the guilt and penalty phases of the trial.

142 Wn.2d at 883. Viewed consistently with *Brett*, the failure to investigate a mental health defense for Fedoruk fell below an objectively reasonable standard.

C.      Prejudice

We now turn to the question of whether the failure to investigate prejudiced Fedoruk. To merit reversal based on an ineffective assistance claim, a defendant has the burden to show a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). Under this "reasonable probability" standard, the defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case," but must demonstrate a probability of a more favorable result "sufficient to undermine confidence in the outcome" actually obtained. *Strickland*, 466 U.S. at 693-94. The defendant must make this showing "based on the record developed in the trial court." *State v. McFarland*, 127 Wn.2d 322, 337, 899 P.2d 1251 (1995).

The State contends that Fedoruk does not meet these standards because he cites to nothing in the record showing that any expert would be able to testify that he was legally insane or lacked the capacity to form the necessary intent. The State rests this contention on *State v. Turner*, 143 Wn.2d 715, 730, 23 P.3d 499 (2001), in which our Supreme Court rejected a defendant's argument that his attorney's failure to present expert testimony in support of a diminished capacity defense denied him the effective assistance of counsel. The *Turner* court

15

reasoned that "Turner has failed to show that his counsel's performance was deficient" because "[i]t cannot be determined from the record on appeal that any expert would have testified that Turner lacked the ability to form the specific intent required to commit the crimes with which he was charged." 143 Wn.2d at 730.

The defendant in *Turner* was evaluated at Eastern State Hospital and found legally sane at the time he committed his crimes. 143 Wn.2d at 721. Here, in contrast, Fedoruk was only evaluated for competency to stand trial, not for legal sanity at the time of the killing. The examining psychologist expressly opined that "Fedoruk does have a major mental illness, but he is not *currently* experiencing symptoms of a mental disease or defect that would" render him incompetent to stand trial. CP at 45 (emphasis added). The facts underlying *Turner* are distant enough from those presented here to rob it of any precedential force in this appeal.

On the other hand, evidence in the record, discussed above, shows that Fedoruk had already been found not guilty by reason of insanity of a number of felony charges, based on evaluations from two qualified professionals. His history of serious mental illness is well documented, as set out in the Facts, above. His actions on the night of the killing were bizarre under any yardstick, as shown by testimony described above. Furthermore, the State conceded in the trial court that Fedoruk had "a legitimate basis to raise the defense" and that "it could change the outcome of the trial." VRP at 401. This evidence shows a reasonable likelihood that the outcome of the trial would have differed had Fedoruk been able to present an insanity or diminished capacity defense. Although not conclusive, this evidence is sufficient to demonstrate a probability of a more favorable result "sufficient to undermine confidence in the outcome" actually obtained. *Strickland*, 466 U.S. at 694. With that, Fedoruk was prejudiced by

16

the failure to investigate a mental health defense. Accordingly, Fedoruk received ineffective assistance of counsel, and we reverse his conviction.[3]

## II. PROSECUTORIAL MISCONDUCT

Fedoruk contends that the prosecutor committed flagrant and ill-intentioned misconduct in closing argument, misconduct that merits review despite defense counsel's failure to object. Specifically, Fedoruk claims that the prosecutor (1) undermined the presumption of innocence by telling the jury that Fedoruk's failure to rebut portions of the State's evidence amounted to "agreement" with the State's case; (2) encouraged the jury to decide the case based on irrational considerations rather than probative evidence and sound reason; (3) showed the jury evidence not admitted at trial; and (4) invaded the province of the jury by expressing personal opinions on questions of fact.

We agree that some of the prosecutor's actions constituted misconduct. However, because we reverse this case on other grounds, we do not address whether Fedoruk waived this challenge or whether the prosecutor's conduct prejudiced him. We address the prosecutorial misconduct because it may arise on remand.

A.      Controlling Law

To prevail on a prosecutorial misconduct claim, a defendant must show that the prosecutor's conduct was both improper and prejudicial "in the context of the record and all of

---

[3] Fedoruk also argues that his counsel unreasonably failed to object to the State's closing argument. Because we reverse based on ineffective assistance of counsel for failing to investigate a mental health defense, we need not address this argument. For the same reason, we need not address Fedoruk's argument that the trial court erred in denying his motion for a continuance.

17

the circumstances of the trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). To establish prejudice, the defendant must "show a substantial likelihood that the misconduct affected the jury verdict." *Glasmann*, 175 Wn.2d at 704. A defendant who failed to object at trial must also establish "that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Glasmann*, 175 Wn.2d at 704.

A prosecutor who "'throw[s] the prestige of h[er] public office . . . and the expression of h[er] own belief of guilt into the scales against the accused'" deprives the defendant of the constitutional right to a fair trial. *Glasmann*, 175 Wn.2d at 703-04 (quoting *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011)) (alteration in original) (internal quotation marks omitted). A prosecutor enjoys "wide latitude to argue reasonable inferences from the evidence," but "must 'seek convictions based only on probative evidence and sound reason.'" *Glasmann*, 175 Wn.2d at 704 (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). A prosecutor, furthermore, "'should not use arguments calculated to inflame the passions or prejudices of the jury.'" *Glasmann*, 175 Wn.2d at 704 (quoting AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE std. 3-5.8(c) (2d ed. 1980)). Although a prosecutor may "point out a lack of evidentiary support for the defendant's theory of the case" or "state that certain testimony is not denied, without reference to who could have denied it," *State v. Sells*, 166 Wn. App. 918, 930, 271 P.3d 952 (2012), *review denied*, 176 Wn.2d 1001 (2013), the general rule is that the State "cannot comment on the lack of defense evidence because the defense has no duty to present evidence." *State v. Cheatham*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

In *Glasmann*, the prosecutor used a PowerPoint presentation featuring images taken from a security camera video, pictures of the victim's injuries, and the defendant's booking photograph, with added commentary and text taken from trial testimony or witnesses' recorded statements. 175 Wn.2d at 701. A series of slides repeatedly featured the booking photo superimposed with the word "GUILTY" in red letters. *Glasmann*, 175 Wn.2d at 702. As the slides appeared on the screen, the prosecutor delivered the following summation:

> "You've been provided with a number of lesser crimes if you believe the defendant is not guilty of the crimes for which the State has charged him, but the evidence in this case proves overwhelmingly that he is guilty as charged, and that's what the State asks you to return in this case: Guilty of assault in the first degree; guilty of attempted robbery in the first degree; guilty of kidnapping in the first degree; and guilty of obstructing a police officer. Hold him accountable for what he did on October 23rd, 2004, by finding him guilty as charged. Thank you."

*Glasmann*, 175 Wn.2d at 702. The defense did not object. *Glasmann*, 175 Wn.2d at 702.

In holding that the prosecutor committed flagrant and ill-intentioned misconduct, the *Glasmann* court relied on the fact that "[o]ur courts have repeatedly and unequivocally denounced the type of conduct that occurred in this case." 175 Wn.2d at 704. First, the *Glasmann* court noted the "'long-standing rule [that] consideration of any material by a jury not properly admitted as evidence vitiates a verdict when there is a reasonable ground to believe that the defendant may have been prejudiced.'" 175 Wn.2d at 705 (quoting *State v. Pete*, 152 Wn.2d 546, 555 n.4, 98 P.3d 803 (2004)) (internal quotation marks omitted). In rejecting the State's argument that it had merely combined properly admitted evidence with argument based on the law and facts, the *Glasmann* court held that "the prosecutor's modification of photographs by adding captions was the equivalent of unadmitted evidence," and "a prosecutor must be held to

19

know that it is improper to present evidence that has been deliberately altered in order to influence the jury's deliberations." 175 Wn.2d at 706.

The *Glasmann* court next pointed out that "a prosecutor cannot use his or her position of power and prestige to sway the jury" and quoted at length from the commentary to the American Bar Association, *Standards for Criminal Justice*:

> "The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office."

175 Wn.2d at 706 (quoting commentary to std. 3-5.8). The court went on to discuss the "many cases warn[ing] of the need for a prosecutor to avoid expressing a personal opinion of guilt," and held that "[b]y expressing his personal opinion of Glasmann's guilt through both his slide show and his closing arguments, the prosecutor engaged in misconduct." 175 Wn.2d at 706-07.

B.      Expressions of Personal Opinion and Presentation of Unadmitted Evidence

Here, the trial court admitted no photos of Ischenko's body with "Murder 2" appearing in large red letters above them. Yet the State presented four such images to the jury during closing argument. As in *Glasmann*, "the multiple altered photographs here may well have affected the jurors' feelings about the need to strictly observe legal principles and the care [they] must take in determining [the defendant's] guilt." 175 Wn.2d at 706.

The State correctly points out that the presentation here differs in some respects from that in *Glasmann*. With the exception of the red "Murder 2" heading that appeared over all but two of the slides, the presentation here did not combine images from the evidence with testimony and

argument. In some ways, however, the presentation here is more egregious: although the prosecutor here did not superimpose the word "guilty" over a picture of Fedoruk, she did flatly state that "[t]he Defendant is guilty, guilty, guilty" while flashing the word "GUILTY" in front of the jury in large, red, capital letters on a screen bearing the heading "Murder 2." VRP at 1810; Ex. 287, slide 35. The prosecutor in *Glasmann* at least couched his assertions of guilt in terms of what the evidence showed and the verdict the State asked jurors to return.

Here, the prosecutor did not make the challenged statements only in rebuttal as a fair response to defense counsel's arguments, but began and ended her prepared remarks with direct assertions of Fedoruk's guilt. The assertion of guilt that concluded her prepared remarks followed not a summary of the evidence, but a discussion of Ischenko's virtues, inviting the jury to decide the case based on sympathy. The prosecutor here did not couch her assertions of guilt in terms of the evidence in the case, and she reinforced those assertions with inflammatory images similar to those held improper in *Glasmann*. The prosecutor conveyed to the jury her personal opinion that Fedoruk was guilty. This argument was improper.

C.    Appeal to Intuition

In addition, the prosecutor's argument suggested that the jurors should take the fact that Fedoruk's family members suspected Fedoruk based on their "intuition" as evidence of his guilt, going so far as to state that "[t]he whole family doesn't buy [Fedoruk's story] because their intuition has told them the truth." VRP at 1801. This argument encouraged jurors to decide the case based on considerations other than "probative evidence and sound reason." *Casteneda-Perez*, 61 Wn. App. at 363. Further, the prosecutor here did not make these arguments in rebuttal as a fair response to some related argument by the defense. Instead, this appeal to the

jury to infer guilt from others' intuitions served as the theme of her prepared remarks. Therefore, this argument was improper.

D.    Characterization of Fedoruk's Failure to Rebut the State's Evidence as "Agreement"

In closing, the prosecutor also repeatedly referred to matters on which the defense presented no evidence as "agreements" between both sides. VRP at 1776. This characterization plainly conveyed that Fedoruk had made an affirmative assertion about a matter by presenting no evidence on it. In doing so, the prosecutor presented a false depiction of what Fedoruk said and undermined the presumption of innocence by transmuting the defendant's silence into evidence against him. The State points out that the prosecutor "couched the term 'agreement' in what was the undisputed and uncontroverted evidence." Br. of Resp't at 65. Although true, at least in the first instance that the prosecutor used the word, this falls far short of establishing that the remarks did not effectively comment on Fedoruk's failure to present evidence. As Fedoruk points out, the State argued based on the purported agreements that only one issue remained: identity. Under *Cheatham*, 150 Wn.2d at 652, the prosecutor effectively commented on the lack of defense evidence by arguing that because he did not present contrary evidence, Fedoruk agreed with the State's position. This, also, was improper.

In legal doctrines, some distinctions seem cut with a jeweller's eye. Others seem more a work of watercolor, with one shade blurred into another. Although the line between zealous advocacy and improper argument may seem drawn in part in watercolor, the conduct at issue here fell outside its blurred zones. The prosecutor's actions described above constituted misconduct.

22

No. 43693-1-II

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

### III. THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ON MANSLAUGHTER AS A LESSER INCLUDED OFFENSE

Fedoruk argues that the trial court violated his statutory and constitutional rights to have the jury consider first degree manslaughter as a lesser included offense of second degree intentional murder. Under *State v. Workman*, 90 Wn.2d 443, 447-49, 584 P.2d 382 (1978), the resolution of that challenge depends in part on the evidence introduced. Because the evidence introduced on remand may differ from that in the record before us, we decline to address this issue.

### IV. DENIAL OF THE DEFENSE MOTION TO SUPPRESS FEDORUK'S STATEMENTS TO LAW ENFORCEMENT

Fedoruk argues that the trial court erred in admitting various statements he made to law enforcement officials for one or more of three different reasons: (1) he did not make the statements voluntarily; (2) he made the statements under custodial interrogation without having been advised of his *Miranda* rights; and (3) the officials failed to scrupulously honor Fedoruk's initial invocation of his right to remain silent. Fedoruk assigns error to 20 of the findings and conclusions the trial court entered following the CrR 3.5 hearing. Because we reverse Fedoruk's conviction for the reasons set out above, it is not necessary to decide whether any error in admitting Fedoruk's statements also warrants reversal. However, because the issues may arise on retrial, we address them in the interest of judicial economy.

23

A.    Voluntariness

In reviewing a due process claim that a suspect made statements to police involuntarily, we consider whether, under the totality of the circumstances, including the suspect's powers of resistance and the pressure brought to bear by the interrogators, the "'defendant's will was overborne.'" *Dickerson v. United States*, 530 U.S. 428, 433-34, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)). The voluntariness inquiry is necessarily fact-specific. *Gallegos v. Colorado*, 370 U.S. 49, 52, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962). "The length of the questioning, the use of fear to break a suspect, [and] the youth of the accused are illustrative of the circumstances on which cases of this kind turn." *Gallegos*, 370 U.S. at 52 (citations omitted). Also relevant is "the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) (citations omitted).

We reject Fedoruk's due process argument because, other than the acts involved in detaining him, Fedoruk does not allege that the authorities applied any pressure whatsoever to get him to answer their questions. In essence, he argues that, given his mental illness, these acts alone sufficed to overbear his will. However, he cites no authority for such a proposition. In *State v. Aten*, 130 Wn.2d 640, 665, 927 P.2d 210 (1996), our Supreme Court rejected a similar claim:

> although Respondent was diagnosed as suffering from grief and depression, there is no evidence that officers deliberately exploited her mental condition to obtain her statement or acted in a way that would overcome her will to resist giving a statement.

24

To illustrate the kind of showing necessary to establish that statements were involuntary, in a recent federal case involving a 17-year-old suspect, *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011), the court held a confession involuntary where teams of police officers interrogated the boy in shifts for over 12 hours. Fedoruk does not come close to making such a showing here. The trial court did not err in concluding that Fedoruk made his statements to police voluntarily.

B.     *Miranda* Violations

We consider unchallenged findings of fact entered by a trial court after a CrR3.5 hearing, as well as findings supported by substantial evidence in the record, verities on appeal. *State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). In evaluating a claim that a defendant's statements are inadmissible under *Miranda* and its progeny, however, we review de novo a trial court's rulings that a suspect was or was not in custody, invoked the right to remain silent, initiated further conversation with police, or has knowingly and intelligently waived his *Miranda* rights. *See In re Pers. Restraint of Cross*, 180 Wn.2d 664, 680-81, 327 P.3d 660 (2014) (invocation and custody present mixed questions of law and fact subject to de novo review); *State v. Daniels*, 160 Wn.2d 256, 261, 156 P.3d 905 (2007) (*Miranda* issues are questions of law); *Terrovona v. Kincheloe*, 852 F.2d 424, 428 (9th Cir. 1988) (voluntariness of waiver of the right to remain silent "is essentially a legal judgment"). We are not bound by a trial court's mischaracterization of a legal conclusion as a finding of fact. *State v. Ross*, 141 Wn.2d 315, 309-10, 4 P.3d 130 (2000).

1. Custodial Interrogation While on the Porch

Fedoruk argues that the trial court erred in admitting statements he made while on the porch at his home prior to being advised of his *Miranda* rights because he made them under custodial interrogation. We agree.

A person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda*, 384 U.S. at 444. Failure to give these advisements renders any statements elicited inadmissible for most purposes in a criminal trial. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994). The requirement that police administer *Miranda* advisements does not attach, however, until "there has been such a restriction on a person's freedom as to render him in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (internal quotation marks omitted).

Whether someone is in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (quoting *Mathiason*, 429 U.S. at 495); *accord Daniels*, 160 Wn.2d at 266. In determining whether a suspect is in custody, courts conduct an objective inquiry:

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines

26

and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."

*J.D.B. v. North Carolina*, --- U.S. ---, 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)) (internal quotation marks omitted) (footnote omitted). Thus, a reviewing court considers the situation from the point of view of a reasonable person in the suspect's position, but does not consider the subjective beliefs or intentions of either the suspect or the police.

Here, five armed and uniformed officers confronted Fedoruk at his house. They repeatedly told him to keep his hands out of his pockets and prohibited him from going back inside the house. Before asking Fedoruk about Ischenko's car, the officers handcuffed him and ordered him to sit on the porch. At this point, no reasonable person could have felt free to terminate the questioning and leave: indeed, Fedoruk apparently tried to do so a number of times but was ordered to stay put. *See Orozco v. Texas*, 394 U.S. 324, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969) (suspect surrounded by four officers in his bedroom was in custody).

We hold that, once handcuffed and ordered to sit on the porch, Fedoruk was in custody for purposes of *Miranda*. The trial court erred in concluding that Fedoruk was not in custody until placed in the patrol car and in admitting statements Fedoruk made after being cuffed but before Deputy Robinson administered the *Miranda* warnings.

2. Fedoruk's Unprompted Statements to Robinson in the Patrol Car

Fedoruk argues that the trial court also erred in admitting the statements he made to Deputy Robinson in the patrol car after being read the *Miranda* warnings because police

continued to interrogate him after he unequivocally invoked the right to remain silent. We agree with the trial court that Fedoruk unequivocally invoked his right to remain silent when he told Deputy Robinson, "I don't want to talk to you." VRP at 193. Because Fedoruk's statements to Deputy Robinson were not the product of interrogation, however, the prophylactic rules laid down in *Miranda* do not apply, and Fedoruk's invocation of the right to remain silent thus has no bearing on the statements' admissibility.

The trial court found that Fedoruk's statements to Deputy Robinson were "spontaneous" and concerned "the specific considerations of the case," concluding that Fedoruk "initiated this conversation and thus waived his right to remain silent." CP at 9. Whether Fedoruk validly waived his rights, however, is not the proper inquiry.

The United States Supreme Court has specified that

> the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation . . . the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent[, t]hat is . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Thus, in *State v. McIntyre*, we held admissible McIntyre's spontaneous in-custody statements, made prior to receiving the *Miranda* warnings, on the grounds that the statement was not prompted by questioning or other conduct equivalent to interrogation, and the actions of the police were merely those normally attendant to arrest. 39 Wn. App. 1, 6, 691 P.2d 587 (1984).

By merely returning to the patrol car to retrieve some papers, Deputy Robinson did not do anything that he should have known was reasonably likely to elicit an incriminating response:

28

Deputy Robinson's conduct was merely that normally attendant to arrest and custody. Fedoruk's statement in the patrol car was thus not the product of interrogation, and the *Miranda* safeguards do not apply. The trial court did not err in admitting Fedoruk's statements to Deputy Robinson in the patrol car.

3. Fedoruk's Statements to Gilchrist

Even with the conclusion that Fedoruk's unprompted statements in the patrol car were admissible, we cannot accept the trial court's conclusion that Fedoruk's statement to Detective Reece, "I don't want to talk to you," VRP at 242-43, qualified as a knowing and intelligent waiver of the right to remain silent with respect to Deputy Gilchrist.

The admissibility of statements obtained by interrogation after a person in custody has invoked his or her *Miranda* rights depends on whether the authorities "'scrupulously honored'" the suspect's right to cut off questioning. *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (quoting *Miranda*, 384 U.S. at 479). Police may subject a suspect who invoked the right to counsel to further interrogation if (1) the suspect subsequently initiated further communication with officers, and (2) the suspect knowingly and intelligently waived the previously asserted right. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (holding that "even if a conversation [following invocation of the right to counsel] is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver"); *Aten*, 130 Wn.2d at 666. The analysis is generally the same for the right to remain silent. *See Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

29

Whether a suspect, after invoking his *Miranda* rights, "initiate[d]" further discussion depends on whether the suspect's subsequent statement "evinced a willingness and a desire for a generalized discussion about the investigation," or was "merely a necessary inquiry arising out of the incidents of the custodial relationship." *Bradshaw*, 462 U.S. at 1045-46. Whether a purported waiver of the right to counsel or the right to remain silent is valid depends on the totality of the circumstances, "'including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.'" *Bradshaw*, 462 U.S. at 1046 (quoting *Edwards v. Arizona*, 451 U.S. 477, 486 n.9, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)).

"[A] suspect may, if he chooses, selectively waive his Fifth Amendment rights by indicating that he will respond to some questions, but not to others." *United States v. Lorenzo*, 570 F.2d 294, 297-98 (9th Cir. 1978). A suspect's waiver of *Miranda* rights, furthermore, "is not irrevocable[:] *Miranda* and its progeny allow an interrogee effectively to withdraw his waiver and fully assert his Fifth Amendment rights in the midst of the interrogation process." *Lorenzo*, 570 F.2d at 297.

Deputy Gilchrist admitted that, when he interpreted the sentence "I don't want to talk to you" as an expression of Fedoruk's willingness to speak to him in Detective Reece's absence, he was under the erroneous understanding that Fedoruk had previously expressed to Deputy Robinson a willingness to speak to police. VRP at 195-197. As discussed, the trial court correctly determined that the same words, when previously spoken to Deputy Robinson, constituted an unequivocal invocation of Fedoruk's right to remain silent. The difference between the two situations is only that two officers were present in the second instance, and Fedoruk allegedly pointed at one, Detective Reece, as he uttered the words. The record makes

clear, however, that Detective Reece was the lead investigator in charge of the interrogation and that Fedoruk's hands were cuffed together. Thus, Fedoruk was only capable of pointing at one officer at a time, and pointed to the officer in charge of the interrogation. We hold that, by interrogating Fedoruk for an hour and a half without further clarification, Deputy Gilchrist failed to "scrupulously honor[]" Fedoruk's invocation of his right to remain silent. *Miranda*, 384 U.S. at 479. The trial court erred in admitting the statements Fedoruk made to Deputy Gilchrist.

CONCLUSION

We hold that defense counsel's failure to timely retain a mental health expert or investigate the possibility of a mental health defense amounted to deficient performance and that Fedoruk has shown a reasonable probability that the deficient performance prejudiced him. Accordingly, we reverse Fedoruk's conviction and remand for further proceedings consistent with this opinion.

BJORGEN, A.C.J.

We concur:

MAXA, J.

LEE, J.

31