# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51367-6-II |
| Respondent, | |
| v. | |
| BRIAN K. TERWILLEGER, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — Brian Terwilleger appeals from his convictions of third degree assault and second degree malicious mischief, arguing that his convictions should be reversed because (1) he was deprived of effective assistance of counsel when his attorney did not adequately investigate and did not present a mental health defense, and (2) the trial court erred in admitting statements that he made to police. Terwilleger raises additional arguments in a statement of additional grounds (SAG).

We decline to decide whether Terwilleger was deprived of effective assistance of counsel because the record does not provide a sufficient basis on which to determine whether his attorney's performance was deficient. We further hold that the trial court did not err in admitting statements that Terwilleger made to police because there was substantial evidence that he voluntarily waived

his *Miranda*[1] rights and voluntarily made the statements.  Finally, we hold that Terwilleger's SAG claims do not warrant reversal of his convictions.

Accordingly, we affirm.

FACTS

I. THE INCIDENT

During the morning hours of September 11, 2016, Terwilleger and his girlfriend, Alicia Sackrider, had been visiting Sackrider's uncle, Jeffrey Holloway, at Holloway's residence. Terwilleger and Holloway initially wanted to attend church that morning, but after some disagreement between the three individuals, Holloway decided that he would go to the store in town instead.  Holloway began walking toward his car across the yard.  Terwilleger, meanwhile, was in his own car.

Holloway reached his Chevy Blazer, placed his key inside the lock on the driver's side door, and then heard the sound of an engine revving.  Immediately after hearing this noise, Holloway was knocked off his feet by the impact of Terwilleger's car, a Pontiac, hitting his Chevy Blazer.  Sackrider ran across the yard towards the two vehicles immediately after the collision. Terwilleger was "yelling and cussing" and said that "it was an accident" and that his foot "got stuck on the pedal."  2 Verbatim Report of Proceedings (VRP) at 149.

Holloway lost consciousness temporarily upon impact and sustained several minor injuries as a result of the collision.  The Chevy Blazer was damaged in the rear passenger quarter panel and on the rear bumper.  The damages to the Chevy were estimated to cost approximately $3,000 to repair.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Prior to this incident, Holloway and Terwilleger were acquainted with one another through Sackrider and had spent time together on multiple occasions. The two men had a friendly relationship and had never been involved in a disagreement with one another. Holloway believed that the incident was bizarre and "out of nowhere." *Id.* at 155.

An Elma police officer was the first to arrive, and he detained Terwilleger in handcuffs in the back of his patrol vehicle. Grays Harbor County Deputy Sheriff Jeremy Holmes, the primary officer in charge of the investigation, was the second officer to arrive at the scene. Based on Holmes's observation of the tire marks leading to Terwilleger's Pontiac and the tire marks from the back tires of Holloway's Chevy, Holmes believed that Terwilleger drove directly into Holloway's Chevy.

After Holmes advised Terwilleger of his *Miranda* rights, Terwilleger indicated that he understood his rights and agreed to speak with Holmes. Terwilleger then informed Holmes that the clutch of his Pontiac had stuck, causing him to strike the Chevy. After seizing and securing the vehicle, Holmes observed that the vehicle had an automatic transmission, and there was no clutch. Terwilleger also informed Holmes that he was afraid for Sackrider's safety because he was worried "that she was going to be taken." *Id.* at 87.

During his conversation with Terwilleger, Holmes noted that Terwilleger "seem[ed] kind of off" and that Terwilleger's behavior led him "to question [Terwilleger's] mental state at the time." *Id.* at 40. Despite some reservations regarding Terwilleger's mental state, Holmes believed that Terwilleger was coherent, that he understood the questions he was asked, and that he did not appear to be under the influence of any substances.

3

A short time later, Terwilleger was transported to the jail, and Holmes read Terwilleger his *Miranda* rights from an "advice of rights form." *Id.* at 36. Terwilleger signed the advice of rights form, selecting the box on the form that indicated he declined to speak with an officer.

The next day, on September 12, 2016, Detective Richard Ramirez attempted a second contact with Terwilleger while Terwilleger was in custody. After briefly introducing himself, Ramirez read Terwilleger his *Miranda* rights from a department statement form. Terwilleger agreed to give a statement to Ramirez by initialing the form. During their conversation, Terwilleger appeared to be coherent, and his answers to questions were responsive. Terwilleger did not present any signs of impairment or confusion at that time. After Ramirez transcribed Terwilleger's statement, Terwilleger reviewed the document for any necessary corrections prior to signing. Terwilleger then signed the document and initialed any areas where he and Ramirez made corrections.

Although Ramirez did not believe that Terwilleger was impaired or confused during their conversation, he noted in his report that Terwilleger appeared to have "some mental health issues." *Id.* at 49. Ramirez observed that Terwilleger appeared "like he was having some kind of anxiety problems, going on." *Id.* at 48. Terwilleger "rocked a lot," but Ramirez did not believe Terwilleger was experiencing an anxiety attack during their conversation. *Id.* at 51. Whatever issues Ramirez noticed in Terwilleger's demeanor at the time were not so significant that Ramirez felt the need to conclude the interview.

However, Terwilleger did make some statements to Ramirez regarding "the Mexican Mafia and them wanting to hurt [Sackrider]" that Ramirez believed could be considered "bizarre." *Id.* Terwilleger explained to Ramirez that he believed Holloway was "associated with the Mexican

Mafia," and the reason that he struck Holloway's vehicle was because he believed that "the Mexican Mafia was going to take [Sackrider] away and hurt her." *Id.* at 114.

Terwilleger admitted that there was no mechanical issue with his vehicle and that "whatever happened was all him." *Id*. at 116. Terwilleger elaborated that his plan was to "block [Holloway's] vehicle from leaving." *Id*. at 114. When Terwilleger got into his vehicle, he made a U-turn and "went towards" Holloway's Chevy Blazer at a "normal rate of speed, but at the last second, decided that he was going to ram the vehicle and accelerate it." *Id*. Terwilleger claimed that he did not know that Holloway was near his Chevy Blazer at that time. When Ramirez asked why Terwilleger had initially informed Holmes that the collision occurred as a result of his clutch sticking, Terwilleger said it was because he thought that Holmes was associated with the Mexican Mafia as well.

## II. PRETRIAL PROCEEDINGS

The State charged Terwilleger with one count of third degree assault and one count of second degree malicious mischief. The third degree assault charge was predicated on an allegation of criminal negligence under RCW 9A.36.031(1)(d).

On October 17, 2016, defense counsel asked the trial court to continue the trial set for November 1, 2016 because he "discovered last week that Mr. Terwilleger has dementia." VRP (Oct. 17, 2016) at 5. Defense counsel asked the trial court for additional time to obtain medical records and to contact Terwilleger's physician. Terwilleger, however, was opposed to continuing the trial and did not want to sign a speedy trial waiver. The trial court determined that there was good cause to continue the trial and granted defense counsel's request for a continuance over Terwilleger's objection.

By November 21, 2016, defense counsel had not yet received all the medical records that he requested from Terwillegar's physicians, and he moved for an additional continuance. Defense counsel also "request[ed] an order to evaluate Mr. Terwilleger's sanity based on [his] interactions with [Terwilleger] and statements [Terwilleger] made in the police reports." Clerk's Papers (CP) at 24. Terwilleger did not agree with his attorney's request for a continuance, and he asked the trial court if he could represent himself. Terwilleger explained that he gave defense counsel the name of his mental healthcare provider so that defense counsel could request records, but defense counsel failed to submit a request until approximately a month after the initial continuance had been granted. Terwilleger maintained that he did not wish to continue delaying his trial and that he did not need the records because he was "very confident to stand trial." VRP (Nov. 21, 2016) at 15. The trial court agreed that there was good cause to order the continuance as well as the competency evaluation, especially in light of Terwilleger's request to waive his right to counsel.

On January 6, 2017, Terwilleger submitted several pro se motions directly to the trial court, including one in which he claimed that the statements he made to Ramirez while in custody should be suppressed. Terwilleger argued that he previously invoked his right to silence with Holmes, and he alleged that he made the statements when he was in a "dementia state of mind or . . . a dementia 'like' state of mind known as delirium . . . when questioned at jail facility." CP at 308. Defense counsel informed the trial court that he discussed the pro se motions with Terwilleger, that they decided they would proceed by entering an order for a competency evaluation, and that defense counsel would pursue any remaining motions thereafter. Terwilleger apparently abandoned his request to proceed with self-representation.

Terwilleger also submitted a letter to the trial court on January 24, 2017, in which he asked for "answers as to why [defense counsel] and [the State] have failed to investigate that the defendant has a very serious case of [post-traumatic stress disorder (PTSD)] with a [sic] overlapping issue from a traumatic brain injury [(TBI)]." *Id.* at 40. Terwilleger noted that defense counsel did not seek an evaluation or investigate those issues, nor did defense counsel schedule an appointment with any mental health experts. Terwilleger then stated that he doubted that defense counsel intended to raise a mental health defense. He confirmed that "[t]his case does have a very small amount of mental health issues," though Terwilleger claimed the issues "do not effectthe outcome of trial" and the medical records were unrelated to his "throttle sticking." *Id.* at 40-41.

Dr. Les Hutchins at Western State Hospital evaluated Terwilleger's competence on February 1, 2017. Terwilleger denied any history of psychiatric hospitalization or any prior diagnosis of a mental health disorder, though he stated he was prescribed antipsychotic and antidepressant medications while in custody. Mental Health Division records showed that Terwilleger had "five contacts with the King Regional Support Network" during a two-week period in 2016 for "Major Depressive Disorder, recurrent, mild," and three other "contacts" with the Thurston/Mason regional support network between 2003 and 2008. CP (Jan. 5, 2018) at 5.

In 2014, Terwilleger was involved in a motorcycle accident. Terwilleger reported that following this accident, he suffered from memory issues, though he noted that the memory problems could have also been caused by his alcohol and pain medication use following the accident. Terwilleger informed Dr. Hutchins that he had "a substantial history of methamphetamine use and alcohol dependence," though he denied any recent dependence on substances. *Id.* at 6. There remained an open question regarding whether Terwilleger had been

using or abusing alcohol and pain medication prior to the incident on September 11, 2016, and Dr. Hutchins noted that Terwilleger's "presentation at the time of the alleged events is as likely as not the result of polysubstance abuse." *Id.* at 7. Dr. Hutchins ultimately determined that Terwilleger was competent to stand trial.

Terwilleger sent additional letters to the trial court in early February, which the trial court forwarded to counsel on February 9, 2017. Within these letters, Terwilleger explained that he was experiencing "PTSD – TBI, lack of control, fear[,] confusion." CP at 78. Terwilleger also printed pages from websites discussing PTSD and Wernicke's encephalopathy, in which he appeared to notate which conditions and symptoms he was experiencing.

Approximately one week later, on February 18, 2017, Terwilleger wrote to the trial court regarding "10 motions" that he filed. *Id.* at 119. One of these motions was to "allow a [sic] expert or third party witness/testimony." *Id.* at 120. In particular, Terwilleger asked the trial court to allow expert testimony from an individual that he identified as "'Rachel,' mental health professional" from Columbia Wellness, regarding his mental health condition. *Id.* at 132.

On February 21, 2017, Terwilleger was found competent to stand trial by an agreed order. When the trial court began to address the trial schedule in light of the completed competence evaluation, Terwilleger again reiterated his concern regarding waiving his right to speedy trial. He argued that "my competency has been fine, and I have never, ever needed mental health evaluation." 1 VRP at 20.

Terwilleger was released pretrial on March 31, 2017, and trial was scheduled to begin on July 25, 2017. Terwilleger filed an omnibus response stating that the nature of defense was a general denial. Terwilleger also declined to stipulate to continuous chain of custody.

### III. CrR 3.5 HEARING

The trial court held a CrR 3.5 hearing to determine whether the statements Terwilleger made to Holmes and Ramirez were admissible. During this hearing, Holmes and Ramirez testified consistently with the facts as stated above.

Terwilleger did not recall his conversation with Holmes at the scene. Terwilleger attributed his memory problems to "a traumatic brain injury with a motorcycle crash a little over three years ago" and to the fact that he "went into a state of delirium, which is confusion brought on by the PTSD." 2 VRP at 58-59. Terwilleger only vaguely recalled filling out an advisement of rights form once in jail and only vaguely recalled selecting the option that he did not want to speak with law enforcement. Terwilleger also had no recollection "at all" of being interviewed by Ramirez. *Id.* at 60.

The trial court admitted the statements, noting that there was an absence of any evidence demonstrating that Terwilleger was experiencing a state of delirium during either conversation. Terwilleger's lack of memory regarding the event, the trial court explained, was akin to "an alcoholic blackout," and just because Terwilleger did not remember the interviews did not mean that the statements were not made voluntarily. *Id.* at 65. The trial court noted that there was also "no evidence presented" regarding the traumatic brain injury or PTSD beyond Terwilleger's own testimony. *Id.* at 67. However, the fact that Terwilleger invoked his right to silence on one occasion indicates he had the ability to understand his rights during the other occasions. Reviewing the totality of the circumstances, the trial court was persuaded that the statements made to Holmes at the scene and to Ramirez while in custody were voluntary. The trial court did not enter written findings and conclusions following this hearing.

IV. Trial

Holmes, Ramirez, and Holloway testified consistently with the facts as stated above. In addition, Kyle Hartley, the auto body shop manager who repaired Holloway's Chevy, testified regarding the extent of damage to Holloway's vehicle following the collision.

Holloway's Chevy appeared to sustain the most damage to the rear bumper on the passenger side. In total, the estimate for repair was valued at approximately $3,000. That total included repairs to *both* the passenger's and driver's side rear quarter panels, the rear bumper, the driver's side rear door, and other minor parts. Hartley could not determine from observation alone whether the damage on the driver's side of the vehicle occurred as a result of the collision with Terwilleger's Pontiac. However, most of the repair and labor hours were spent on the passenger side of the vehicle and very little time was spent on the driver's side. The labor alone, which amounted to 7.8 hours, cost just over $400. And the majority of the approximately $3,000 estimate was attributed to the cost of repairing the quarter panel and bumper.

The defense theory at trial was that the collision between Terwilleger's Pontiac and Holloway's Chevy was an accident. Terwilleger argued that he intended to park next to Holloway's Blazer when he accidentally accelerated and struck Holloway's vehicle, not realizing that Holloway was standing by his car at that time. Terwilleger did not present any expert testimony related to his mental health condition nor did he otherwise attempt to present a mental health related defense.

The jury found Terwilleger guilty of third degree assault and second degree malicious mischief.

V. SENTENCING

Terwilleger's offender score was 5, and his standard range sentence was 17 to 22 months for the third degree assault conviction and 4 to 12 months for the second degree malicious mischief conviction. Terwilleger asked the court to impose 17 months on the assault conviction and 12 months on the malicious mischief conviction.

The State interjected by stating,

> [S]omething that the Court might want to know in taking everything into consideration is that Mr. Terwilleger did not want any kind of mental health defense. And again, [defense counsel] can correct me if I'm wrong on that. But I think that [defense counsel] was pursuing that early on.

VRP (Sept. 8, 2017) at 4 -5. Defense counsel then agreed and said, "That's correct. That is an accurate statement." *Id.* at 5. However, when given the opportunity to address the trial court, Terwilleger indicated that he wanted to raise mental health at trial. Terwilleger explained that his PTSD "should have been part of [his] defense," and he "submit[ted] paperwork on that." *Id.* at 8.

The trial court explained that although Terwilleger raised mental health issues in several pro se motions, he would later "withdraw those motions." *Id.* at 9. Terwilleger objected and stated that he "[n]ever withdrew" the motions. *Id*.

The trial court explained to Terwilleger that he failed to follow the appropriate procedures necessary to present a mental health defense. The trial court explained,

> [I]t's your choice on whether or not you're going to claim some sort of mental incapacity as far as, you know, inability due to a mental disease or defect to commit the crime. So that was really a decision that you made. And so -- and not using that, then those items are not considered.

*Id.* at 13-14. Defense counsel did not present any mitigating evidence to support a lesser sentence. The trial court sentenced Terwilleger to 20 months confinement on the third degree assault

11

conviction and 12 months confinement on the second degree malicious mischief conviction. Terwilleger appeals.

## DISCUSSION

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

#### A. LEGAL PRINCIPLES

Criminal defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). To prevail on a claim of ineffective assistance of counsel, Terwilleger has the burden of demonstrating both that (1) his counsel's representation was deficient because it fell below an objective standard of reasonableness and (2) that he was prejudiced by this deficient performance. *State v. Linville*, 191 Wn.2d 513, 518, 423 P.3d 842 (2018). We need not address both prongs of the test if Terwilleger's showing on one prong is insufficient. *State v. Emery,* 174 Wn.2d 741, 755, 278 P.3d 653 (2012).

To determine whether counsel's performance was deficient, "[t]he court must engage in a fact-specific inquiry into the reasonableness of an attorney's actions, measured against the applicable prevailing professional norms in place at the time." *In re Pers. Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 99, 351 P.3d 138 (2015). Review of counsel's performance is highly deferential, and we will "strongly presume reasonableness" in order to "combat the biases of hindsight." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017).

The presumption of reasonableness may be rebutted when a criminal defendant demonstrates "an absence of any legitimate trial tactic that would explain counsel's performance." *Id*. Counsel's strategic decisions made after a complete investigation are "'virtually

unchallengeable'"; however, counsel's strategic decisions made following a less than complete investigation are reasonable only if the decision to limit the investigation was itself the product of reasonable professional judgment. *Id.* (internal quotation marks omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)). A reasonable investigation by defense counsel includes engaging the assistance of an expert where necessary to conduct an adequate defense. *Lopez*, 190 Wn.2d at 116.

If counsel's performance was deficient, we next consider whether the deficient performance resulted in prejudice. *Id.* "Prejudice exists if there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Id.* (internal quotation marks omitted) (quoting *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017)). A reasonable probability is one that is sufficient to undermine confidence in the trial's outcome, and it is a lower standard than a preponderance standard. *Id.*

"[W]hen 'the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record.'" *Linville*, 191 Wn.2d at 525 (quoting *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995)). Where the defendant's claim on appeal compels this court to consider evidence or facts beyond the trial record, "'the appropriate means of doing so is through a personal restraint petition'" rather than a direct appeal. *Id.* (quoting *McFarland*, 127 Wn.2d at 335).

B.  U̲NDERLINE̲D̲ ̲H̲E̲A̲D̲I̲N̲G̲ D̲EFENSE C̲OUNSEL'S A̲LLEGED F̲AILURE TO I̲NVESTIGATE

Relying on *State v. Fedoruk*, 184 Wn. App. 866, 339 P.3d 233 (2014), Terwilleger argues that defense counsel's performance was deficient because defense counsel was aware of Terwilleger's mental health issues yet failed to adequately investigate and did not present a mental health defense.  The State counters that defense counsel did not perform deficiently because defense counsel acted in accord with Terwilleger's desire not to present a mental health defense at trial.  We decline to decide whether defense counsel's performance was deficient because the record is insufficient to determine the extent of defense counsel's investigation and whether there was a tactical reason for his decision to limit investigation and to not present a mental health defense.

Terwilleger admits that the record regarding the actions his counsel took to investigate a mental health defense is "imperfect."  Br. of Appellant at 16.  Nevertheless, Terwilleger maintains that the record is sufficient for review because it shows that defense counsel did not retain an expert to conduct a mental health evaluation.

In *Fedoruk*, there was sufficient evidence in the record regarding the extent of defense counsel's investigation to allow appellate review.  After the State successfully moved in limine to exclude testimony regarding Fedoruk's mental illness during a CrR 3.5 hearing, Fedoruk's counsel moved for a 60-day continuance on the eve of trial to pursue a not guilty by reason of insanity affirmative defense.  *Fedoruk*, 184 Wn. App. at 875-76.  Defense counsel informed the trial court that "'an issue has arisen that creates a requirement . . . to pursue a defense theory *not previously pursued*.'"  *Id.* at 881 (alteration in original).  This court held that based on counsel's statements,

it was apparent that counsel had not previously retained a mental health expert and investigated a mental health defense. *Id.*

Here, the record reflects that defense counsel made some attempt to investigate a possible mental health defense shortly after Terwilleger was arraigned. But there is no evidence regarding which physicians defense counsel contacted, what information was contained in the medical records that defense counsel received, whether defense counsel made any attempt to contact potential mental health experts to conduct a forensic evaluation, and importantly, whether Terwilleger agreed to participate in additional mental health evaluations after he was deemed competent to stand trial. Indeed, Terwilleger objected to continuing trial at a hearing following entry of the competence order, stating, "[M]y competency has been fine, and I have never, ever needed mental health evaluation." 1 VRP at 20.

We cannot determine on this record whether counsel truly failed to investigate Terwilleger's mental health or to what degree. Nor can we determine whether counsel intended to undertake an investigation of Terwilleger's mental health but was instructed by Terwilleger, who had been found competent to stand trial, not to do so.

C. COUNSEL'S FAILURE TO PRESENT A MENTAL HEALTH DEFENSE AT TRIAL, FAILURE TO PRESENT EXPERT TESTIMONY AT THE CrR 3.5 HEARING, AND FAILURE TO PRESENT MITIGATION EVIDENCE AT SENTENCING

For the same reason that we are unable to determine whether counsel performed deficiently by allegedly not investigating Terwilleger's mental health, we are likewise unable to determine whether counsel performed deficiently by not presenting a mental health defense at trial, expert mental health testimony at the CrR 3.5 hearing, or mitigation evidence at sentencing. On this record, we are unable to determine whether counsel had a reasonable strategic basis for foregoing

15

a mental health defense. There is conflicting evidence in the record that could suggest that counsel was following the direction of his competent client who did not wish to present evidence of his mental health at trial.

On this record, we are unable to determine whether counsel performed deficiently. Because Terwilleger must show both deficient performance and prejudice, we have insufficient information to decide this claim. *See Emery,* 174 Wn.2d at 755. Consequently, we decline to do so.

## II. VOLUNTARINESS OF TERWILLEGER'S STATEMENTS

Terwilleger claims that the trial court erred when it admitted statements he made after he received his *Miranda* warnings. Terwilleger argues that his mental health condition made him incapable of both voluntarily waiving his *Miranda* rights and voluntarily making the statements themselves. We hold that based on the totality of the circumstances, the trial court did not err when it found that Terwilleger voluntarily waived his *Miranda* rights and that he voluntarily made statements to police. Therefore, the trial court properly admitted Terwilleger's statements.

### A. LEGAL PRINCIPLES

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Washington Constitution provides coextensive protection of this same right. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). To that end, custodial statements made by an accused individual must be excluded unless the statements were preceded by a full advisement of rights and the individual knowingly, intelligently, and voluntarily waived those rights. *State v. Radcliffe*, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008).

We will not disturb a trial court's determination that a waiver of rights was voluntary if the trial court found, by a preponderance of the evidence, that the statements were voluntary and if substantial evidence in the record supports the finding. *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). Evidence is substantial "where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Courts must look to the totality of the circumstances to determine whether a statement was compelled or whether it was made voluntarily. *State v. DeLeon*, 185 Wn.2d 478, 486, 373 P.3d 95 (2016). Circumstances relevant to determining voluntariness include

> the "crucial element of police coercion;" the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation.

*Unga*, 165 Wn.2d at 101 (quoting *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)).

During a CrR 3.5 hearing, the trial court determines whether "a statement of the accused" is admissible. CrR 3.5(a); *State v. Williams*, 137 Wn.2d 746, 751, 975 P.2d 963 (1999). A trial court must enter written findings and conclusions following a CrR 3.5 hearing. CrR 3.5(c). Failure to enter written findings and conclusions is an error, but the error is harmless if the trial court's oral findings are sufficient to allow appellate review. *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008), *modified on remand*, 158 Wn. App. 272, 246 P.3d 196 (2010).

B. ANALYSIS

Terwilleger assigns error to the trial court's findings (1) that he voluntarily waived his *Miranda* rights while speaking to police and (2) that the statements he made to police were

voluntary. Terwilleger also challenges the trial court's conclusion that these statements were therefore admissible. The trial court held a CrR 3.5 hearing, and it found that *Terwilleger's* statements were made voluntarily and that Terwilleger voluntarily waived his *Miranda* rights. The trial court did not enter written findings and conclusions as required under CrR 3.5(c), but its oral findings are sufficiently extensive to permit appellate review. *See id*.

There was substantial evidence supporting the trial court's findings. Terwilleger was fully appraised of his rights prior to every police interview, he acknowledged his rights, and he agreed to speak with the officers prior to giving his statements. Terwilleger reviewed the written statement that Ramirez composed and approved its accuracy, initialing places where Ramirez made any necessary corrections. Terwilleger also initialed the section of the statement wherein he agreed to waive his *Miranda* rights. There was also no evidence that Terwilleger was coerced or threatened by police.

In addition, Terwilleger invoked his right to silence prior to the second interaction with Holmes, indicating Terwilleger's awareness of the rights he waived during the other two interviews. *Athan*, 160 Wn.2d at 381 (holding that the defendant's "subsequent invocation of his *Miranda* rights supports a finding that he knowingly, voluntarily, and intelligently waived his right to remain silent prior to that point").

Although both officers recognized that Terwilleger exhibited signs of mental health issues and Terwilleger made statements that Ramirez believed were "bizarre," the totality of the circumstances supports the trial court's finding that the statements were voluntary. 2 VRP at 51. A defendant's mental health condition is a relevant consideration, but it is not dispositive. *State v. Aten*, 130 Wn.2d 640, 664, 927 P.2d 210 (1996). In *Aten*, our Supreme Court held that a

defendant's waiver of rights and subsequent confession were voluntary although she claimed that she had a "mental disability," she was suffering from emotional distress, and she was impaired by anti-anxiety medications. *Id*. Our Supreme Court noted that during questioning, the defendant was "calm, subdued, purposeful and oriented to her surroundings and herself. She spoke clearly, had no trouble expressing herself and showed no sign of being sedated." *Id*.

Similarly, here, although Holmes believed Terwilleger seemed "kind of off," Holmes also observed that Terwilleger was coherent and that Terwilleger understood the questions he was asked. 2 VRP at 40. Ramirez believed that Terwilleger may have had anxiety or a different type of mental health condition, but Terwilleger did not exhibit any signs of confusion or impairment during the interview. Ramirez also perceived Terwilleger's demeanor as coherent and responsive.

Terwilleger testified that he was in a "state of delirium" and that he could not remember providing either the statement to Holmes or the statement to Ramirez due to a prior traumatic brain injury. *Id.* at 59. The trial court did not find this testimony credible and was not persuaded that Terwilleger's statements and waiver were rendered involuntary by evidence that Terwilleger had no memory of the interactions. We defer to the fact finder on credibility issues following a CrR 3.5 hearing. *State v. Broadaway*, 133 Wn.2d 118, 134, 942 P.2d 363 (1997).

Terwilleger also argues that the officers exploited his apparent mental health issues to coerce his statements, rendering them involuntary. However, Terwilleger does not identify any evidence in the record showing that the officers took improper advantage of his mental health condition to elicit his responses. There is no indication in the record that Terwilleger's "will was overborne" by coercive or manipulative police tactics. *Unga*, 165 Wn.2d at 102.

Although Terwilleger may have exhibited some symptoms of a mental health condition, substantial evidence supports the trial court's finding that Terwilleger voluntarily made statements to police, therefore substantiating the trial court's conclusion that Terwilleger waived his rights. *See Athan*, 160 Wn.2d at 380. Consequently, the trial court did not err in admitting Terwilleger's statements.

### III. SAG ISSUES

#### A. PRO SE MOTION FOR MENTAL HEALTH EXPERT TESTIMONY

Terwilleger claims that the trial court erred when it declined to consider his pro se motions requesting expert testimony from a mental health professional. Terwilleger submitted this motion directly to the trial court while he was represented by counsel. A trial court is vested with the discretion to decline to consider pro se motions filed by a defendant while the defendant is represented by competent counsel. *In re Pers. Restraint of Quinn*, 154 Wn. App. 816, 841, 226 P.3d 208 (2010) (citing *State v. Bergstrom*, 162 Wn.2d 87, 97, 169 P.3d 816 (2007)). Therefore, we hold that the trial court acted within its discretion when it declined to consider Terwilleger's pro se motion.

#### B. CHAIN OF CUSTODY OF TERWILLEGER'S VEHICLE

Terwilleger claims that because his Pontiac was "'not entered into evidence,'" the vehicle was "'[t]ainted evidence'" that should not have been admissible at trial. SAG at 2. We hold that, to the extent Terwilleger asserts there was a chain of custody issue, Terwilleger's claim fails because no physical objects related to the Pontiac were admitted into evidence and the photographs depicting damage were properly authenticated.

The evidence related to Terwilleger's Pontiac that was admitted at trial included photographs that Holmes took during his investigation and the tow report that Holmes completed following the incident. To admit photographic evidence, "the proponent must put forward a witness 'able to give some indication as to when, where, and under what circumstances the photograph was taken, and that the photograph accurately portrays the subject illustrated.'" *State v. Sapp*, 182 Wn. App. 910, 914, 332 P.3d 1058 (2014) (quoting *State v. Newman*, 4 Wn. App. 588, 593, 484 P.2d 473 (1971)). Here, Holmes authenticated the photographs. Holmes took the photographs himself, and he confirmed that they were unchanged and an accurate depiction of what he witnessed when he responded following the incident.

Photographs are also not physical objects, and therefore they are also not typically the kind of "not readily identifiable" and "susceptible to alteration by tampering or contamination" evidence that "is customarily identified by the testimony of each custodian in the chain of custody from the time the evidence was acquired." *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002). Because no such evidence pertaining to Terwilleger's Pontiac was admitted, we hold that Terwilleger's claim fails.

C. SUFFICIENCY OF THE EVIDENCE

Terwilleger claims that the evidence was insufficient to prove that he caused over $750 worth of damage to Holloway's vehicle as was necessary to sustain his second degree malicious mischief conviction under RCW 9A.48.080(1)(a). We hold that the evidence was sufficient to prove that he caused the requisite amount of damage.

Evidence is sufficient to sustain a conviction if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.

*State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). In a sufficiency of the evidence claim, the defendant admits the truth of the State's evidence and the court views the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the State. *Id.* at 265-66. Credibility determinations are made by the trier of fact and are not subject to review. *Id.* at 266. Circumstantial and direct evidence is equally reliable. *Id.*

The evidence here was sufficient to allow a rational trier of fact to determine that Terwilleger caused over $750 worth of damage to Holloway's Chevy. Terwilleger claims that the testimony from the auto body expert proves that he caused only $400 worth of damage, but Terwilleger misinterprets the record. The auto body expert testified that the cost of *labor* was $400. Most of labor hours were spent repairing the passenger side of the vehicle where Terwilleger's Pontiac collided with Holloway's Chevy. The total cost of repair, including labor, was valued at approximately $3,000, and most of the repairs were attributed to the cost of fixing the rear quarter panel and bumper. Holloway's Chevy sustained damage in this location following the collision with Terwilleger's Pontiac.

There was some uncertainty raised by the auto body expert regarding whether a portion of the total costs were associated with repairs made to the driver's side of the vehicle that could not be attributed to the collision with Terwilleger's Pontiac. However, when the inferences are considered in the light most favorable to the State, a rational trier of fact could find that Terwilleger caused over $750 worth of damage to Holloway's car. We hold that Terwilleger's sufficiency of the evidence claim as to his second degree malicious mischief conviction fails.

No. 51367-6-II

CONCLUSION

We decline to decide whether Terwilleger was deprived of effective assistance of counsel. We hold that the record is insufficient to determine whether Terwilleger's counsel performed deficiently when he allegedly failed to investigate and did not present a mental health defense. We also hold that the trial court did not err when it admitted Terwilleger's statements to Holmes and Ramirez because substantial evidence supports the trial court's finding that Terwilleger voluntarily made statements to police after he voluntarily waived his *Miranda* rights. With respect to Terwilleger's SAG, none of the issues he raises warrant reversal of his convictions.

Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
CRUSER, J.

We concur:

_____
MAXA, P.J.

_____
GLASGOW, J.

23