# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>   v.<br><br>EARL C. MCCORMACK,<br><br>               Appellant. | No. 56951-5-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, J. — Earl C. McCormack appeals the trial court's denial of his motion to continue the trial date in order to obtain an evaluation for "pathological intoxication." McCormack claims the trial court abused its discretion in denying the motion and violated his right to present a defense. McCormack also alleges he received ineffective assistance of counsel when his defense counsel failed to investigate McCormack's mental health issues and failed to investigate the possibility of a pathological intoxication defense. Additionally, McCormack appeals his convictions following a jury trial for second degree identity theft (count I), harassment of a criminal justice participant (count II and count III), and intimidating a public servant (count IV). McCormack argues there is insufficient evidence to support each of his convictions.

Because McCormack, who was represented by counsel, moved pro se to continue his trial the day before trial was set to begin, when he had no supporting evidence of "pathological intoxication," and after his trial had already been continued twice, we hold that the trial court did not abuse its discretion in denying McCormack's motion to continue. Additionally, because

McCormack did not inform his counsel of any mental health issues until the day before trial and because McCormack's counsel discussed possible intoxication defenses with McCormack prior to trial, McCormack's counsel did not render ineffective assistance. Finally, because sufficient evidence exists for each of McCormack's convictions challenged on appeal, we affirm McCormack's convictions for second degree identity theft (count I), harassment of a criminal justice participant (count II and count III), and intimidating a public servant (count IV).

## FACTS

### A.    BACKGROUND

On August 20, 2021, Washington State Patrol (WSP) Trooper Sean Self was on routine patrol. Trooper Self received information regarding a vehicle, a dark blue truck with gray splotching, driving southbound on I-5 in an unsafe manner. Trooper Self positioned himself on a highway onramp south of the truck's approximate location in order to intercept it. WSP Trooper Jeb Jewell joined Trooper Self on the onramp in another vehicle.

Trooper Self saw the truck come under an overpass traveling southbound on I-5. He entered I-5 from the onramp behind the truck, and Trooper Jewell followed. Trooper Self noted that the truck tailgated several cars, drove above the speed limit, made lane changes without signaling, and in one instance cut off another vehicle. Trooper Self activated his emergency lights.

In response, the driver of the truck initially slammed on the brakes and swerved over the fog line. However, the driver kept driving until he took an offramp. The driver followed the road from the offramp until he parked in a gravel lot. Trooper Self followed the driver, also parked in the gravel lot, approached the driver's side of the vehicle, and noted there was only one individual in the car.

The driver of the truck sat facing forward and did not initially respond to Trooper Self knocking on the driver-side window. When the driver did finally respond to Trooper Self, Trooper Self noticed a half-empty open beer bottle in the front seat cupholder. Additionally, Trooper Self smelled a "strong odor of intoxicants," and observed that the driver had "bloodshot, watery eyes, and his eyelids were drooping down." 1 Verbatim Rep. of Proc. (VRP) (Mar. 22, 2022) at 153.

Trooper Self requested the driver's license or other form of identification. The driver stated he did not have his license, but identified himself as Jackson C. McCormack with a specific birthdate. However, before providing the birthdate, McCormack stated his middle initial was actually "M" and not "C."

Trooper Self asked McCormack if he was willing to perform field sobriety tests.[1] McCormack agreed and stepped out of the truck. Trooper Self then began to administer the horizontal gaze nystagmus (HGN) test.[2] During this time, Trooper Jewell ran McCormack's information through the WSP dispatch system. Trooper Jewell could not match McCormack's name with the truck's vehicle identification number.

Prior to completion of the HGN test, McCormack informed Trooper Self he needed to urinate. Trooper Self allowed McCormack to so do nearby. When McCormack returned, Trooper Self asked McCormack if he was on any medications. McCormack stated he was on a medication for depression and anxiety. According to McCormack, he had been taking that medication for

---

[1] Field sobriety tests are "designed to make observations on someone's ability to do . . . basic motor functions; balance, walk in a straight line." 1 VRP (Mar. 22, 2022) at 154.

[2] An HGN test is one of the field sobriety tests. When an officer administers an HGN test, he or she observes "whether or not [a person's] eyes smoothly follow a stimulus in front of them." 1 VRP (Mar. 22, 2022) at 154.

approximately "four months straight." Ex. 10 (424),[3] at 7:06-7:12. McCormack had last taken a dose that morning.

When Trooper Self began to re-administer the HGN test, McCormack stated he no longer wished to perform the field sobriety tests. McCormack stated that he was not impaired and that he had not been driving the vehicle. After McCormack refused to perform further sobriety tests, Trooper Self placed McCormack under arrest for driving under the influence (DUI).

As Trooper Self arrested McCormack, McCormack requested Trooper Self's and Trooper Jewell's names, which they provided. McCormack insisted he had done nothing illegal. McCormack tensed his arms to prevent being handcuffed and told Trooper Self and Trooper Jewell to "get the f[***] out of [his] face." Ex. 10 (424), at 9:35-9:50. According to Trooper Self, he and Trooper Jewell needed to use "some physical force" to move McCormack's hands behind him in order to handcuff him. 1 VRP (Mar. 22, 2022) at 160.

After Trooper Self and Trooper Jewell handcuffed McCormack, they led him to Trooper Self's patrol car. During that time, McCormack made various angry statements, including, "I want your names and your families' names," "Get the f[***] out of my face," "I'm gonna kill both you guys," "I'm gonna kill both your f[***]ing families," and "I'm a f[***]ing mobster, you know that sh[**]." Ex. 10 (424), at 10:09-10:10, 10:22-10:23; Ex. 10 (338), at 1:58-2:11. While McCormack

---

[3] Exhibit 10 consists of two video files. The first video file, ending in the digits -424, is footage from Trooper Self's vehicle's dashboard camera, which captures footage from the front of Trooper Self's vehicle. The second video file, ending in the digits -338, is footage from Trooper Self's rear seat camera, which captures footage from the backseat of Trooper Self's vehicle. This opinion will distinguish between the two video files according to the digits in their respective file names.

was agitated, he did not appear to resist being led to the patrol car. When McCormack sat in the patrol car, he sat sideways such that his feet hung out the door.

Trooper Self read McCormack his *Miranda*[4] rights. McCormack continued to make angry comments at Trooper Self and Trooper Jewell. Comments McCormack made included: "You guys are dead," "You arrest me, you're dead," "Your whole family is dead you little b[****]," "You're f[***]ing dead too you stupid f[***]," "I killed my mom," and "You're a stupid f[***]ing b[****]." Ex. 10 (338), at 2:27-5:45. During that time, Trooper Self asked McCormack if there was anyone who could come pick up the truck. McCormack replied with the phone number and name of his father, "Jack" McCormack. 1 VRP (Mar. 23, 2022) at 181.

After McCormack provided his father's information, Trooper Self attempted to close the door of the patrol car. Trooper Self needed to ask McCormack to move his leg several times before McCormack complied. Once Trooper Self closed the door, for the next several minutes, he and Trooper Jewell processed McCormack's vehicle. McCormack's father was unable to pick up the truck, so the troopers arranged to have it towed.

Inside the patrol car, McCormack made "constant statements." 1 VRP (Mar. 23, 2022) at 178. The statements included, "You're a f[***]ing piece of sh[**] white boy Indian, you're the first one to die . . . smile while your kids get f[***]ing killed," "I'm with the f[***]ing mob, b[****]," "If you impound my f[***]ing car, see what the f[***] happens," "I am a serial killer." Ex. 10 (338), at 8:14-13:43. McCormack also yelled racial epithets at Trooper Jewell, who is half-Thai. The racial comments included, "I'm killing all the Chinese people . . . I'm stabbing them in

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the f[***]ing face," "You know how many Chinese people I'm going to kill now?" and "You touched [my car] your little Chinese family is dead." Ex. 10 (338) at 14:39-19:10.

Trooper Self then transported McCormack to the Providence Centralia Hospital for a blood draw in relation to McCormack's DUI arrest. While in the patrol car at the hospital, McCormack slammed his head into the partition between the front and back seat six times. As a result, McCormack injured himself with a large gash across his forehead that required medical treatment.

After the visit to the hospital, Trooper Self booked McCormack into the Lewis County jail under the name "Jackson M McCormack." 1 VRP (Mar. 23, 2022) at 185. Trooper Self then issued a DUI citation under the same name. The following day, another WSP officer contacted Trooper Self with information that led Trooper Self to believe that McCormack's name was not Jackson M. McCormack. Trooper Self subsequently discovered that McCormack's name was actually Earl C. McCormack. Upon running McCormack's true name through the WSP dispatch system, Trooper Self also discovered that McCormack's license was suspended. Additionally, Trooper Self learned that there was an individual named Jackson M. McCormack with the same birthdate McCormack had provided, who resided in Mountlake Terrace.

The State charged McCormack with second degree identity theft (count I), two counts of harassment of a criminal justice participant performing official duties (count II and count III), and intimidating a public servant (count IV).

In an omnibus order prior to trial, McCormack asserted a general denial of his charges. McCormack did not give notice of an intent to assert diminished capacity or intoxication defenses.

In November 2021, McCormack requested new counsel due to a communication breakdown with his appointed counsel. The trial court granted the request and appointed new

counsel. In December 2021, McCormack requested new counsel again, once more due to a communication breakdown with his attorney. The trial court again granted McCormack's request and appointed new counsel, Donald Blair, with a note that the court would likely not entertain further new counsel requests from McCormack. As a result of the new counsel appointments, McCormack's trial was continued twice and ultimately set for March 22 and March 23, 2022.

B.    MOTION TO CONTINUE

On March 21, 2022, the trial court held a pretrial conference. During the pretrial conference, McCormack stated he was not ready to go to trial the next day because he had not had sufficient time to consult with his attorney. McCormack's counsel disagreed with McCormack's characterization of the extent to which he was able to communicate with McCormack about his defenses and possible outcomes. Counsel informed the trial court that he had met with McCormack several times and they talked about the facts of the case at length, which was fairly straightforward because the incident was caught on video. In their discussions, McCormack was able to recall what he said and did during the incident, which correlated with what was in the video. Counsel also informed the court that he had spoken with the two troopers involved, negotiated the case with the State, explained the likelihood of a conviction and the consequences of a conviction to McCormack, and was prepared to go to trial the next day.

McCormack stated he wanted to continue the trial so he could have time to look into and possibly be evaluated for "pathological intoxication." VRP (Mar. 21, 2022) at 10. McCormack had never previously mentioned pathological intoxication. McCormack stated:

> I've been looking at stuff on the law library, and I want time. I want to waive my right for 60 days, but I want time to be able to look into certain things for my defense, such as pathological intoxication, I want to get evaluated for that. . . . I

want more evaluations. I want an expert that will testify on behalf of me, . . . if that's possible. . . .

I'm not going to let my lawyer tell me what I read and . . . what is possible. We haven't looked into any of it. We haven't discussed any of it. And I'm not ready for trial, at all, and I don't trust his counsel because he hasn't been able to give me any. He's just read me my discovery. That's not counsel.

THE COURT: What defense is it you were hoping to raise?

[MCCORMACK]: Pathological intoxication, and also the law—I'm going through the laws, I'm learning a lot in the interpretations, and I haven't been able to talk to [my counsel] about any of this, and I'm trying to research it myself but I'm not a lawyer, so it's taking a longer time.

. . . .

. . .I've been trying to go through the law library and look at the legal definition for all the words and all the interpretations and what they mean and what they should apply for, or could apply for, and stuff like that. And I'm just trying to get an argument that I feel comfortable with, that . . . supports what I believe happened from the discovery. I'm still working on that.

I don't feel comfortable with . . . just getting a . . . reading of my discovery and saying, "You're gonna lose." I want to be able to have a little bit more time to prepare a defense.

. . . .

. . . Because I don't feel like I would lose, with the arguments that I have.

THE COURT: [W]ell, tell me what those argument [sic] would be, so I can understand it.

[MCCORMACK]: The arguments that I have are that . . . these threats that were alleged to have happened, that I said when I was in a blackout drunk, . . . all these threats that are supposed to be, they're not reasonable threats. . . .

And also . . . the alleged identity theft was not used to aid, abet or commit any crime. And I'm looking into that, and the wording and the interpretations on all of that. And it's . . . still taking a little bit of time, but I feel like my defense, I don't feel like I would lose. I don't feel like my lawyer feels. I don't feel like I'm going to lose.

VRP (Mar. 21, 2022) at 10-12. The trial court asked McCormack's counsel to respond to McCormack's statements. McCormack's counsel then addressed McCormack regarding their discussions of his case, confirming with McCormack that McCormack was able to tell counsel what happened during the incident. Counsel also pointed out that McCormack's claim of being blacked out drunk was contrary to his ability to recall what happened.

The trial court expressed skepticism that evidence of pathological intoxication would be admissible or that "there's any scientific basis to allow an expert to testify in court to this theory of pathological intoxication." VRP (Mar. 21, 2022) at 17. The trial court denied McCormack's request for a continuance.

C. TRIAL

McCormack's jury trial began the next day, on March 22, 2022. The State proposed jury instructions, which did not include any instructions on an intoxication defense or diminished capacity. McCormack's counsel did not propose jury instructions nor did he object to the instructions proposed by the State.

1. Preliminary Hearing

McCormack expressed dissatisfaction that the trial court denied his request for a continuance. The trial court responded, "[Y]ou brought a motion to continue yesterday on your own, and I heard your motion, and I considered it, and I denied the motion." 1 VRP (Mar. 22, 2022) at 9. McCormack also expressed frustration at his counsel and his counsel's purported failure to consult with McCormack on possible defenses. In response, counsel informed the court that he had met with McCormack a number of times to discuss the facts of the case, which included

a discussion about intoxication and that McCormack may need to testify at trial if he wished to have his intent be presented to the jury. Counsel also informed the court that McCormack's claim of "habitual intoxication" had not been previously raised, despite their having had discussions about intoxication. 1 VRP (Mar. 22, 2022) at 13.

McCormack, who had been attending the hearing via WebEx from jail, left the hearing. The trial court treated McCormack's departure as McCormack voluntarily absenting himself from the proceedings. McCormack did not return at any point during the proceedings.

    2.    Trooper Self's Testimony

Trooper Self testified during trial that he has been employed with WSP since April 2020. Prior to his employment with WSP, he completed a 10-month training program, which consisted of an arming class, practice collision and DUI investigations, and field training. Trooper Self stated that he often encounters intoxicated individuals while on duty and he had dealt with angry, drunken individuals prior to his encounter with McCormack.

Trooper Self also testified that after he handcuffed McCormack and led him towards the patrol vehicle, McCormack made statements to Trooper Self and Trooper Jewell. Trooper Self stated:

> So as we were walking him back to the car, [McCormack] said, "You want this sh[**]. Get the f[***] out of my face," and as he was sitting in the car with his legs out and I told him to move his legs into the car, he said, "I'll kill you both. I'll kill your families. I'm in the mob."

1 VRP (Mar. 22, 2022) at 162.

Trooper Self stated that as he read McCormack his *Miranda* rights, Trooper Self was concerned about McCormack's threats to kill him and Trooper Jewell and their families. Trooper

Self's concern was based on McCormack's "demeanor and behavior" and "[b]ecause [he must] take everything everybody says seriously." 1 VRP (Mar. 23, 2022) at 178. Trooper Self believed his fear was reasonable.

After Trooper Self secured McCormack in the patrol car, he closed the door. Trooper Self testified he did not hear all of McCormack's statements from inside the patrol car. However, Trooper Self heard McCormack say that McCormack had killed his mother. Trooper Self testified that he was concerned about this statement. After learning McCormack's true name, Trooper Self called several police agencies to determine if McCormack's statement was true. Trooper Self learned that while McCormack's mother was deceased, McCormack did not in fact kill her.

3. Trooper Jewell's Testimony

Trooper Jewell also testified during the trial. Trooper Jewell was hired by WSP in June 2019. Trooper Jewell completed at least 1,000 hours of training prior to becoming commissioned as a trooper.

Trooper Jewell testified he was also concerned about McCormack's threats to kill him and his family. Trooper Jewell stated, "Mr. McCormack, especially during the process when [McCormack] was in the back of the car, we were working on towing his vehicle, really honed in on my race and his desire to stab every Asian person and Chinese person he saw in the face." 1 VRP (Mar. 23, 2022) at 221. Trooper Jewell testified that he took McCormack's threats seriously. Trooper Jewell stated that he has rarely had interactions "that escalated to this nature of repeated 'I'm going to kill your family, I'm going to kill your family, I'm going to kill your family, I'm going to kill you.'" 1 VRP (Mar. 23, 2022) at 223-24. Trooper Jewell felt that McCormack "really focused" on a plan to kill Trooper Jewell and his family. 1 VRP (Mar. 23, 2022) at 224. Trooper

11

Jewell subsequently discussed with his wife whether she should carry a gun "more frequently" as a result of this incident. 1 VRP (Mar. 23, 2022) at 224.

Trooper Jewell also testified that based on McCormack's tone and manner, he did not believe that McCormack's statements were jokes or expressions of political beliefs. Trooper Jewell was also concerned that McCormack had killed his own mother, that McCormack was a member of "the mob," and believed that McCormack had the ability to carry out his threats to kill. 1 VRP (Mar. 23, 2022) at 225.

4.      Jury Verdict

The jury found McCormack guilty on all counts. The trial court polled the jury and each juror confirmed that the verdict was his or her verdict. The trial court entered a judgment and sentence, and McCormack was sentenced to 22 months' confinement.

McCormack appeals.

ANALYSIS

A.      MOTION TO CONTINUE

McCormack argues that the trial court abused its discretion when it denied his request for a continuance so he could investigate a possible defense of "pathological intoxication." Br. of Appellant at 20. The State argues that the trial court did not abuse its discretion because McCormack's request for a continuance "was not timely, predicated on a novel and obscure theory for his defense, and raised what equated to a diminished capacity mental defense not previously pleaded." Br. of Resp't at 10. We agree with the State.

As a threshold matter, McCormack brought his motion to continue the trial date pro se even though he was represented by counsel. "The right to proceed pro se and the right to assistance of

counsel are mutually exclusive." *State v. Vermillion*, 66 Wn. App. 332, 340, 832 P.2d 95 (1992), *review denied*, 120 Wn.2d 1030 (1993). McCormack brought the motion without informing his own counsel of his desire to continue the trial in order to evaluate a possible pathological intoxication defense. McCormack had no grounds to bring a pro se motion to continue the trial date when he was represented by counsel; therefore, we need not address the motion on its merits. However, we reach the merits of McCormack's challenge to the trial court's ruling on the motion to continue because the trial court entertained and decided the motion.

### 1. Legal Principles

Trial courts have the discretion to grant or deny a motion for a continuance. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). A trial court's decision is reviewed for abuse of discretion. *Id.* Reviewing courts will not overturn a trial court's decision absent a clear showing that the decision was manifestly unreasonable or based on untenable grounds. *Id.* "In exercising discretion to grant or deny a continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." *Id.* at 273.

A denial to a motion for a continuance may rise to the level of a constitutional violation if that denial prevents a defendant from presenting evidence material to his or her defense. *Id.* at 274-75. Whether there is any constitutional violation is determined on a case by case basis. *Id.* at 275.

### 2. No Abuse of Discretion

McCormack argues that the trial court abused its discretion in denying his motion to continue because "[a] defense based on voluntary intoxication or pathological intoxication would

have been material." Br. of Appellant at 22. Specifically, McCormack argues that his "behavior indicate[s] that he at least meets a threshold meriting further evaluation to determine . . . if an expert supports his contention that he committed the offenses while unable to form intent due to intoxication exacerbating an underlying psychological condition." Br. of Appellant at 28-29.

Here, by the time McCormack brought his motion on the day before trial in March 2022, McCormack's case had been pending since August of 2021. McCormack's trial date had already been continued twice due to McCormack's requests for new counsel. In an omnibus order prior to trial, McCormack stated that he intended to only assert a general denial to his charges, as opposed to asserting defenses of diminished capacity or intoxication. Before McCormack brought his motion to continue the trial, McCormack never once mentioned pathological intoxication or any underlying mental illness. Furthermore, McCormack did not claim he actually had any evidence of pathological intoxication; rather, he wanted an expert to evaluate him to determine whether pathological intoxication was even applicable.

When exercising discretion, trial courts may consider several factors, including materiality and maintenance of orderly procedure. *Downing*, 151 Wn.2d at 273. The record shows that the trial court considered McCormack's request. The trial court stated, "Well, in order for me to give you more time, I have to be convinced that it would be productive, there would be a good reason for doing it." VRP (Mar. 21, 2022) at 17. McCormack could not articulate a reason other than he wished more time to personally research pathological intoxication and an alleged mental health history that required evaluation—which, again, he never mentioned prior to the pretrial hearing.

"Trial courts have discretion to manage their docket and deny continuances in order to do so." *State v. Castillo-Lopez*, 192 Wn. App. 741, 748, 370 P.3d 589, *review denied*, 185 Wn.2d

1038 (2016). Appellate courts will only overturn a trial court's decision if that decision was manifestly unreasonable or based on untenable grounds. *Downing*, 151 Wn.2d at 272. Because McCormack requested a continuance the day before his trial after his trial had already been continued twice, McCormack did not have evidence of pathological intoxication, and McCormack never mentioned any defense other than a general denial of the charges until the eve of his trial, the trial court's denial of McCormack's request to continue the trial was not unreasonable. Therefore, the trial court did not abuse its discretion when it denied McCormack's request for a continuance.

2.      No Violation of a Right to Present a Defense

McCormack alternatively argues that the trial court's denial of his request for a continuance amounted to a violation of his right to present a defense. Specifically, McCormack argues that "the [trial] court's denial of [his] motion to continue was prejudicial," he "had the right to explore a pathological intoxication defense," and "the [trial] court's decision unfairly prejudiced [him] by neutering his ability to propound a complete defense." Br. of Appellant at 31.

Criminal defendants have a constitutional right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. However, defendants "do not have the right to introduce evidence that is irrelevant or otherwise inadmissible." *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004), *review denied*, 154 Wn.2d 1026 (2005); *State v. Arndt*, 194 Wn.2d 784, 812, 453 P.3d 696 (2019) (stating "a defendant's constitutional right to present a defense is not absolute."), *cert. denied*, 142 S. Ct. 726 (2021). "Whether a Sixth Amendment right has been abridged presents a legal question that is reviewed de novo." *Arndt*, 194 Wn.2d at 797.

Here, McCormack's argument presumes the existence of pathological intoxication evidence when the record does not support such a presumption.  Generally, reviewing courts assess whether a defendant's right to present evidence has been violated when evidence has been *excluded*. *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017).  That is not the case here.

McCormack was welcome to explore pathological intoxication or mental health issues as a defense, but, as discussed above, prior to the pretrial hearing, he never once mentioned pathological intoxication nor a mental health history that needed evaluation.  Had McCormack wanted to pursue diminished capacity, for instance, he needed to have disclosed that in the pretrial omnibus order.  *See id.* at 651.  Moreover, McCormack does not even claim or argue that the trial court erred in an evidentiary ruling—indeed, the record does not show that McCormack was in possession of any evidence that was improperly excluded.

Furthermore, and perhaps more importantly, pathological intoxication is not a recognized defense in Washington.  The only reference to pathological intoxication in Washington is in a dissent from a case 40 years ago that discussed whether evidence of intoxication was sufficient to justify an insanity defense.  *State v. Wicks*, 98 Wn.2d 620, 627, 657 P.2d 781 (1983) (Utter, J., dissenting).  McCormack did not assert an insanity defense, diminished capacity defense, or intoxication defense.

Because the trial court did not exclude evidence, it cannot reasonably be said to have neutered McCormack's "ability to propound a complete defense"—especially when the potential defense McCormack argues for was not raised until the day before trial and does not legally exist.  Accordingly, the trial court's denial of McCormack's motion to continue did not violate his right to present a defense.

B.      INEFFECTIVE ASSISTANCE OF COUNSEL

McCormack argues that his defense counsel's representation fell below an objective standard of reasonableness because counsel failed to conduct an investigation into McCormack's mental health issues and whether a pathological intoxication defense was possible. McCormack asserts because he made statements to the troopers in "'a blackout drunk'" state and purportedly has a history of hospitalizations "'in a mental ward,'" his counsel should have investigated a mental health defense. Br. of Appellant at 37. McCormack further argues that "[i]t would be up to an expert to determine whether his mental conditions and intoxication rose to the level to merit requesting that the court grant an instruction for voluntary intoxication or pathological intoxication, but [his] counsel never sought expert evaluation on this question." Br. of Appellant at 38-39. We disagree.

1.      Legal Principles

We review ineffective assistance of counsel claims de novo. *State v. Fedoruk*, 184 Wn. App. 866, 879, 339 P.3d 233 (2014). Individuals possess the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Quy Dinh Nguyen*, 179 Wn. App. 271, 287, 319 P.3d 53 (2013), *review denied*, 181 Wn.2d 1006 (2014). "To prove ineffective assistance of counsel, an appellant must show (1) that his counsel's performance was deficient and (2) that this deficient performance prejudiced him." *State v. Burke*, 132 Wn. App. 415, 419, 132 P.3d 1095 (2006). "Failure to establish either part defeats the ineffective assistance of counsel claim." *Nguyen*, 179 Wn. App. at 287. Courts are highly deferential to a counsel's decisions and a "strategic or tactical decision is not a basis for finding error." *State v. Walters*, 162 Wn. App. 74, 80, 255 P.3d 835 (2011). "The benchmark for judging any claim of ineffectiveness must be

whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

  2.  Failure to Investigate Mental Health Issues

  McCormack argues that despite being "vocal that he had been hospitalized in a mental ward multiple time[s]," his counsel "did not . . . have [him] evaluated by an expert." Br. of Appellant 39. McCormack analogizes his case to *State v. Fedoruk*, where we held that defense counsel's failure to obtain a mental health expert or investigate the possibility of a mental health defense constituted deficient performance and likely prejudiced the defendant. 184 Wn. App. at 881-83. In *Fedoruk*, the defendant had a long history of schizophrenia for which he had been prescribed "numerous psychotropic and antipsychotic medications," had multiple documented admissions to psychiatric hospitals, including an involuntary commitment order from a court, and a history of poor compliance with medication regimens. *Id.* at 871.

  Here, the record shows that McCormack only first mentioned a history of mental health issues and hospitalizations for mental health on the day before his trial. There is no record of a long, documented history of serious mental illness. While McCormack told Trooper Self that he was on a single medication for depression and anxiety, the record does not rise to the level of *Fedoruk*, where the defendant had been on "numerous psychotropic and antipsychotic medications" for his schizophrenia.

  Regardless, there is nothing in the record that shows McCormack ever informed his counsel of his psychiatric hospitalizations. The trial court appointed McCormack's trial counsel three months before his trial, and McCormack met with his counsel several times to discuss his case at

length. McCormack had ample opportunity to discuss his mental health with his counsel. But without any further information, and without anything in the record to indicate that McCormack suffered from mental illness, there was nothing for McCormack's counsel to have investigated. Accordingly, we hold that McCormack's counsel's performance was not deficient.

        3.        Failure to Investigate Voluntary Intoxication or Pathological Intoxication Defense

            a.       Intoxication

McCormack argues there is "no legitimate trial strategy . . . justifying [his] counsel's failure to investigate an intoxication defense." Br. of Appellant at 41. We disagree.

Again, McCormack met with his counsel several times, during which they discussed his case at length, including "the possibility that [McCormack] might have been intoxicated." 1 VRP (Mar. 22, 2022) at 11. McCormack's counsel discussed with McCormack that pursuing an intoxication defense "might be a doubled-edged [sic] sword." 1 VRP (Mar. 22, 2022) at 11. McCormack was also informed that he may need to testify regarding his intent if he pursued an intoxication defense. McCormack chose to not testify, as evidenced by his voluntarily not attending his own trial. Despite the challenges with an intoxication defense, McCormack's counsel emphasized McCormack's likely intoxication during his cross-examination of Trooper Self. Furthermore, "[t]he effects of alcohol are commonly known and jurors can draw reasonable inferences from testimony about alcohol use." *Thomas*, 123 Wn. App. at 782.

The record shows that McCormack's counsel considered an intoxication defense, discussed it with McCormack, and in light of McCormack's decision to absent himself from trial, McCormack's counsel pursued a different strategy. A strategic or tactical decision is not a basis

for finding error. *Walters*, 162 Wn. App. at 80. Therefore, we hold that McCormack's counsel did not render ineffective assistance by not investigating an intoxication defense.

>    b.    Pathological intoxication

McCormack argues that his counsel should have "attempted to obtain an expert to evaluate Mr. McCormack [for pathological intoxication] and the evidence for that defense." Br. of Appellant at 41. Specifically, McCormack asserts that his "bizarre statements and violent behavior when intoxicated" support a pathological intoxication defense. Br. of Appellant at 43. We disagree.

As discussed above, there is no such defense as pathological intoxication in Washington. McCormack's counsel cannot be said to have been deficient for failing to pursue a non-existent defense. *See State v. Clark*, 17 Wn. App. 2d 794, 799, 487 P.3d 549 (2021) (failing to raise novel arguments or theories is not ineffective assistance), *review denied*, 198 Wn.2d 1033 (2022). Also, McCormack's counsel explained why he did not engage an expert or investigate a pathological intoxication defense:

>    THE COURT: And have you considered what experts might be consulted with and hired in a case such as this?
>
>    [COUNSEL]: Well, yesterday was the first time that he had brought up this habitual intoxication phrase. I had never heard of it before yesterday when he wrote it up. He and I talked about—without revealing too much. He . . . and I mentioned this yesterday.
>
>    He and I talked about possibly being intoxicated, and if so, to what level. And . . . his explanation was different yesterday, but during our conversations, he seemed to remember independently without having reviewed discovery. He indicated to me that he remembered a number of different things that had happened during his interactions with these two officers.

> And essentially, it was not—these threats were not true threats, and he was explaining to me why. So I hadn't considered an expert for his habitual intoxication because, based on what he's told me in the past, that wouldn't apply given the fact that he independently remembered a lot of the stuff that happened during his interaction with the troopers.

1 VRP (Mar. 22, 2022) at 12-13. The record shows that McCormack's counsel discussed intoxication with McCormack and that McCormack had opportunity to discuss the possibility of an expert evaluation for pathological intoxication well before the eve of trial. And, as with the intoxication defense discussed above, McCormack's counsel pursued a different strategy based on his conversations with McCormack. Thus, McCormack's claim of ineffective assistance for failure to investigate pathological intoxication fails.

C.    SUFFICIENCY OF EVIDENCE

McCormack argues that there was insufficient evidence to support his convictions of identity theft, harassment, and intimidating a public servant. We disagree.

1.    Standard of Review

The State must prove all elements of a crime beyond a reasonable doubt. *State v. Christian*, 200 Wn. App. 861, 864, 403 P.3d 925 (2017). Evidence is sufficient to support a conviction if, after viewing evidence in a light most favorable to the State, any reasonable juror could find the elements of the crime beyond a reasonable doubt. *State v. Pinkney*, 2 Wn. App. 2d 574, 579, 411 P.3d 406 (2018).

Challenges to sufficiency of the evidence admit the truth of the State's evidence and all reasonable inferences arising therefrom. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265-66, 401 P.3d 19 (2017). We consider direct evidence and circumstantial evidence to be equally reliable. *State v. Ozuna*, 184 Wn.2d 238, 248, 359 P.3d 739 (2015). "We must defer to the trier of fact on

issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *Burke*, 132 Wn. App. at 420. Reviewing courts will reverse convictions only when no rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Fedorov*, 181 Wn. App. 187, 194, 324 P.3d 784, *review denied*, 181 Wn.2d 1009 (2014).

     2.      Identity Theft

       a.      Legal principles

A person commits identity theft if he or she "knowingly obtain[s], possess[es], use[s], or transfer[s] a means of identification . . . of another person, living or dead, with the intent to commit, or to aid or abet, any crime." RCW 9.35.020(1). A person commits identity theft in the second degree if the crime he or she commits does not exceed $1,500 in value. RCW 9.35.020(3)[5]; *State v. Sells*, 166 Wn. App. 918, 923, 271 P.3d 952 (2012), *review denied*, 176 Wn.2d 1001 (2013). The State need not prove that the defendant intended to commit a specific crime; proof of intent to commit any crime is sufficient. *Fedorov*, 181 Wn. App. at 197. The victim must be a real person. *Id.* at 194. Additionally, the defendant must know the victim is a real person. *State v. Zeferino-Lopez*, 179 Wn. App. 592, 599, 319 P.3d 94 (2014). "Actual use of the means of identification is not required in order to convict." *Sells*, 166 Wn. App. at 924.

---

[5] Identity theft in the first degree occurs when "the accused or an accomplice violates subsection (1) of this section and obtains credit, money, goods, services, or anything else of value in excess of one thousand five hundred dollars in value, or when the accused knowingly targets a senior or vulnerable individual in carrying out a violation of subsection (1) of this section." RCW 9.35.020(2). RCW 9.35.020(3) provides: "A person is guilty of identity theft in the second degree when he or she violates subsection (1) of this section under circumstances not amounting to identity theft in the first degree."

"Means of identification" is information or an item that is "personal to or identifiable with an individual or other person," such as "[a] current or former name of the person, telephone number, an electronic address, or identifier of the individual." RCW 9.35.005(3); *see State v. Presba*, 131 Wn. App. 47, 55-56, 126 P.3d 1280 (2005) (holding that a name, social security number, former address, and date of birth all constitute a "means of identification."), *review denied*, 158 Wn.2d 1008 (2006).

b.     Sufficient evidence McCormack committed identity theft

McCormack argues that his use of another's name and birthdate during a traffic stop does not give rise to a reasonable inference of the intent to commit the crimes of driving under the influence[6] or driving with a suspended license.[7] Rather, McCormack argues he only sought to "frustrate or antagonize" the police. Br. of Appellant at 53.

Here, the record shows that McCormack provided the name "Jackson C. McCormack" to Trooper Self when he was first pulled over. McCormack quickly corrected himself and stated his middle initial was actually "M" and not "C." McCormack then provided the specific birthdate. The record reflects that Jackson M. McCormack, with the same birthdate that McCormack provided to Trooper Self, is an actual individual residing in Mountlake Terrace. The record also shows that McCormack's name is not Jackson. Moreover, the fact that McCormack provided a specific name and specific birthdate to Trooper Self, and then *corrected* the middle initial, gives rise to the inference that McCormack knew Jackson M. McCormack was a real person and

---

[6] RCW 46.61.502.

[7] RCW 46.20.342.

knowingly provided Jackson M. McCormack's information. McCormack did not just rattle off a random name or random birthdate.

Trooper Self arrested McCormack for a DUI, and upon learning McCormack's true name, discovered that McCormack's license was suspended. Driving under the influence and driving with a suspended license are both crimes. *See* RCW 46.61.502; RCW 46.20.342. McCormack informed Trooper Self he did not have his driver's license with him when Trooper Self first requested it. Furthermore, McCormack appears to have been aware he was intoxicated because he refused to perform the field sobriety tests. The record shows that McCormack's speech was slurred, he had a strong odor of intoxicants, and he had "bloodshot, watery eyes, and his eyelids were drooping down." 1 VRP (Mar. 22, 2022) at 153. McCormack never actually provided his true name to Trooper Self or Trooper Jewell. On this record, a reasonable juror could infer that McCormack, in providing another's name and birthdate, intended to avoid the consequences of both a DUI and driving with a suspended license.

Viewing the evidence in a light most favorable to the State, a reasonable juror could find the elements of second degree identity theft beyond a reasonable doubt. McCormack's sufficiency of the evidence challenge for this conviction fails.

3.     Harassment of a Criminal Justice Participant

McCormack argues that the State presented insufficient evidence that McCormack made a "'true threat,'" and his statements were instead "hyperbole protected under the First Amendment." Br. of Appellant at 49-50. McCormack also argues that the State provided insufficient evidence that McCormack's threats to Trooper Self and Trooper Jewell placed them in reasonable fear that McCormack would carry out his alleged threats.

a. Legal principles

A person is guilty of harassment if "the person knowingly threatens. . . [t]o cause bodily injury immediately or in the future to the person threatened or to any other person; . . . and . . . [t]he person by words or conduct places the person threatened in reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(a), (b). The State must prove the victim is placed in reasonable fear that the threat will be carried out. *State v. C.G.*, 150 Wn.2d 604, 610, 80 P.3d 594 (2003).

Harassment is a felony if "the person harasses a criminal justice participant who is performing his or her official duties at the time the threat is made; or . . . the person harasses a criminal justice participant because of an action taken or decision made by the criminal justice participant during the performance of his or her official duties." RCW 9A.46.020(2)(b)(iii), (iv). Criminal justice participants include law enforcement officers. RCW 9A.46.020(4).

When the threat involves a criminal justice participant, "the fear from the threat must be a fear that a reasonable criminal justice participant would have under all the circumstances." RCW 9A.46.020(2)(b). There is no harassment "if it is apparent to the criminal justice participant that the person does not have the present and future ability to carry out the threat." RCW 9A.46.020(2)(b). In this case, the parties do not dispute that Trooper Self and Trooper Jewell are criminal justice participants who were performing official duties when McCormack made his statements.

Only a true threat suffices for a harassment conviction. *State v. Kilburn*, 151 Wn.2d 36, 41, 84 P.3d 1215 (2004). True threats are not protected by the First Amendment. U.S. CONST. amend. I; *Kilburn*, 151 Wn.2d at 43 ("To avoid unconstitutional infringement of protected speech,

25

RCW 9A.46.020(1)(a)(i) must be read as clearly prohibiting only 'true threats.'"). Because the statute implicates free speech, we must "'independently examine the whole record to ensure that the judgment does not constitute a forbidden intrusion into the field of free expression.'" *State v. Kohonen*, 192 Wn. App. 567, 577, 370 P.3d 16 (2016) (quoting *State v. Locke*, 175 Wn. App. 779, 790, 307 P.3d 771 (2013), *review denied*, 179 Wn.2d 1021 (2014)).

A true threat is a statement "'that . . . would be interpreted as a serious expression of intention to inflict bodily harm upon or to take the life of another person.'" *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010) (quoting *Kilburn*, 151 Wn.2d at 43). The speaker need not intend to actually carry out the threat. *State v. Boyle*, 183 Wn. App. 1, 8, 335 P.3d 954 (2014), *review denied*, 184 Wn.2d 1002 (2015). However, the speaker must have "some understanding of his statements' threatening character." *Counterman v. Colorado*, *decision filed*, No. 22-138, at 4-5 (U.S. June 27, 2023). Specifically, the speaker must at least recklessly make a threat for it to be considered a true threat, but the threat need not be made with the purpose that the words will be received as threats or knowledge that there is a practical certainty that others will take the words as threats. *Id.* at 10-11. Recklessness in this context means "that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id.* at 11 (quoting *Elonis v. United States*, 575 U.S. 723, 746, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015) (Alito, J., concurring in part and dissenting in part)).

"The nature of a threat depends on a totality of the circumstances, and a reviewing court does not limit its inquiry to a literal translation of the words spoken." *Boyle*, 183 Wn. App. at 9. Jokes, idle talk, political arguments, and hyperbole do not constitute true threats. *Kohonen*, 192 Wn. App. at 576.

      b.     McCormack made true threats

McCormack argues that his "absurd, drunken" statements to Trooper Self and Trooper Jewell were "at most 'hyperbolic expressions of frustration.'" Br. of Appellant at 50 (quoting *Kohonen*, 192 Wn. App. at 583). Conversely, the State argues McCormack's threats were true threats because his statements were continuous, repeated, and he made the statements with specificity to Trooper Self and Trooper Jewell. We agree with the State.

Here, starting when Trooper Self and Trooper Jewell handcuffed McCormack, McCormack became increasingly vitriolic. He made a continuous stream of statements, including, "I'm gonna kill both you guys," "I'm gonna kill both your f[***]ing families," "I killed my mom," "You guys are dead," "You arrest me, you're dead," "Your whole family is dead you little b[****]," "You're f[***]ing dead too you stupid f[***]," and "I'm a f[***]ing mobster, you know that sh[**]." Ex. 10 (338), at 1:58-5:45. McCormack also focused on Trooper Jewell's race, with comments such as: "I'm killing all the Chinese people . . . I'm stabbing them in the f[***]ing face," "You know how many Chinese people I'm going to kill now?" and "You touched [my car] your little Chinese family is dead." Ex. 10 (338), at 14:39-19:10. In the video footage, McCormack is clearly angry and agitated; his comments cannot reasonably be construed as idle talk, political argument, or made in jest. Furthermore, continuous angry and yelled threats to kill the troopers, their families, and members of the Asian race rise well beyond "absurd, drunken" statements and "hyperbolic expressions of frustration." Under these circumstances, it is clear that McCormack's statements were more than recklessly made; McCormack understood that his statements could be interpreted as a serious expression of intention to "cause bodily harm immediately or in the future" to Trooper Self, Trooper Jewell, and their families. Indeed, McCormack's statements *directly*

threatened violence. Because McCormack's statements were not idle talk, political argument, jokes, or hyperbole, and given McCormack's demeanor when he made the threats, we hold that McCormack made true threats.

    c.    Trooper Self's reasonable fear

McCormack asserts that because he was handcuffed and "highly intoxicated," a "reasonable officer would not have been frightened" that McCormack would carry out his threats. Br. of Appellant at 47. We disagree.

Trooper Self testified that, as part of his job, he must "take everything everybody says seriously. You don't know who you're dealing with at the time." 1 VRP (Mar. 23, 2022) at 178. Trooper Self testified that he has dealt with drunken individuals in the past, but was specifically concerned by McCormack's repeated threats to kill him, Trooper Jewell, and their families. Trooper Self was concerned by McCormack's demeanor and behavior, including that McCormack slammed his head into Trooper Self's partition in the patrol car both hard enough and long enough to injure himself with a bloody gash on his forehead that required medical treatment. Additionally, Trooper Self felt considerable concern when McCormack stated that he had killed his mother.

Here, even though McCormack was handcuffed and in the patrol vehicle for most of his threats, and it was likely apparent to Trooper Self that McCormack did not have an immediate ability to carry out his threats, Trooper Self had no way of knowing about McCormack's future ability to carry out his threats. McCormack made claims that he was a mobster and that he had killed his own mother. McCormack argues that he "did not demonstrate any knowledge of the [troopers'] or their [families'] locations or demonstrate knowledge of any personal details indicating the possibility of locating the [t]roopers at a future date." Br. of Appellant 48. However,

McCormack's argument is belied by modern day internet capabilities. McCormack had requested Trooper Self's and Trooper Jewell's names, which they provided. Indeed, it often takes little more than a name and employer, if even that, to facilitate an internet search that could reveal considerable information on a person and their families.

Furthermore, Trooper Self was concerned enough about McCormack's statements that *after* McCormack had been booked into jail, Trooper Self spent time calling around police agencies to determine if McCormack had truly killed his mother. It is unlikely Trooper Self would have done so if he did not have any fear of McCormack's threats. And Trooper Self had previous experiences while on duty encountering persons who are drunk; this was not Trooper Self's first encounter with an angry drunk.

Courts look at the totality of the circumstances when assessing the reasonableness of a criminal justice participant's fear. RCW 9A.46.020(2)(b); *Boyle*, 183 Wn. App. at 9. Based on McCormack's repeated threats to kill Trooper Self and his family, along with McCormack's angry—and at one time, violent—behavior and demeanor, a reasonable juror could find that Trooper Self was placed in reasonable fear. We hold that sufficient evidence exists for Trooper Self's reasonable fear.

> d. Trooper Jewell's reasonable fear

Trooper Jewell testified that he took McCormack's threats seriously. Trooper Jewell stated that he has rarely encountered anyone whose threats escalated as much as McCormack's threats did. According to Trooper Jewell, "McCormack really focused on 'I plan to do this.'" 1 VRP (Mar. 23, 2022) at 224.

Additionally, Trooper Jewell testified that McCormack's threats against Asians were directed towards him. Trooper Jewell stated, "Mr. McCormack, especially during the process when he was in the back of the car, we were working on towing his vehicle, really honed in on my race and his desire to stab every Asian person and Chinese person he saw in the face." 1 VRP (Mar. 23, 2022) at 221. Furthermore, Trooper Jewell, like Trooper Self, was concerned by McCormack's statements that McCormack had killed his mother and that McCormack was in the mob. Because of these threats, Trooper Jewell testified: "I spoke to my wife after this incident and just reiterated, we've discussed before her getting a concealed carry permit, at which point she had prior to this incident. I had reminded her, this incident is an example of why [she] should carry more frequently." 1 VRP (Mar. 23, 2022) at 224.

Like with Trooper Self, Trooper Jewell had no way of knowing about McCormack's future ability to carry out his threats. Moreover, Trooper Jewell was the recipient of an added layer of race-based vitriol. Over the course of several minutes, McCormack emphasized his intention to kill Asians, with statements such as: "You stupid retarded a[**] Asian f[***]," "I'm killing all the Chinese people . . . every Chinese f[***] I see, I'm stabbing them in the f[***]ing face," "You know how many Chinese people I'm going to kill now," and "You touched [my car] your little Chinese family is dead." Ex. 10 (338), at 13:50-19:05. We note that in August 2021, anti-Asian sentiment arising from the COVID-19 pandemic was at its peak.[8] Trooper Jewell feared

---

[8] *See* Associated Press, *More Than 9,000 Anti-Asian Incidents Have Been Reported Since The Pandemic Began*, NPR (Aug. 12, 2021), https://www.npr.org/2021/08/12/1027236499/anti-asian-hate-crimes-assaults-pandemic-incidents-aapi [https://perma.cc/Q6XH-A2UB].

McCormack's statements enough that after the incident, he told his wife to carry a gun "more frequently." 1 VRP (Mar. 23, 2022) at 224.

Considering all of the circumstances—McCormack's continued and focused threats against Trooper Jewell, McCormack's demeanor and behavior, Trooper Jewell urging his wife to carry a gun as result of this incident, along with national anti-Asian sentiment and modern-day internet search capabilities—a reasonable juror could find beyond a reasonable doubt that Trooper Jewell had a fear "that a reasonable criminal justice participant would have." RCW 9A.46.020(2)(b). Therefore, we hold that sufficient evidence exists for Trooper Jewell's fear.

4.      Intimidating a Public Servant

McCormack argues that the State did not present sufficient evidence that he intended to "influence an official action by the officers." Br. of Appellant at 54. Specifically, McCormack contends that there was no "nexus" between his alleged threats and an attempt to influence the troopers. Br. of Appellant at 60.

a.      Legal principles

RCW 9A.76.180(1) provides: "A person is guilty of intimidating a public servant if, by use of a threat, he or she attempts to influence a public servant's vote, opinion, decision, or other official action as a public servant." "A police officer is a public servant." *Burke*, 132 Wn. App. at 421. Here, there is no dispute that Trooper Self and Trooper Jewell are public servants.

A threat is to "communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time." RCW 9A.76.180(3)(a). A threat also includes communication of the intent to cause bodily injury in the future to the person threatened and "any other act which is intended to harm substantially the person threatened or another with respect to

his or her health, safety, business, financial condition, or personal relationships." RCW 9A.04.110(28)(a), (j); *see* RCW 9A.76.180(3)(b).

The State must show two elements: "(1) intent to influence a public servant's official action and (2) a threat." *State v. Toscano*, 166 Wn. App. 546, 552, 271 P.3d 912, *review denied*, 174 Wn.2d 1013 (2012). There must be a nexus between the threat and an attempt to influence; "[t]hreats and resisting arrest are not sufficient." *State v. Moncada*, 172 Wn. App. 364, 365, 289 P.3d 752 (2012). The threats must have a specific purpose. *Id.* at 367. Insults and generalized anger at the circumstances are insufficient to constitute threats for the purposes of intimidating a public servant. *State v. Montano*, 169 Wn.2d 872, 877, 239 P.3d 360 (2010).

> b. McCormack's threats had a specific purpose of influencing a public servant's official action

For the purposes of intimidating a public servant, McCormack does not appear to dispute that he made threats as defined by RCW 9A.76.180 or RCW 9A.04.110(28). Rather, McCormack claims his outbursts are better characterized as generalized angry statements instead of attempts to influence official actions.

Here, the record shows that McCormack made continuous angry statements over approximately 20 minutes. It is true that many of McCormack's threats consist of insults and generalized anger unrelated to influencing official actions. However, McCormack also made more specific threats as Trooper Self and Trooper Jewell performed their official duties. McCormack stated, "You arrest me, you're dead," "If you impound my f[***]ing car, see what the f[***] happens—I'm a f[***]ing boss," and "You touched [my car] your little Chinese family is dead."

Ex. 10 (338), at 2:45-2:55, 13:33, 19:00-19:10. McCormack's specific threats are directly linked to official actions: McCormack's arrest and the towing of McCormack's vehicle.

Viewing the evidence in a light most favorable to the State, a trier of fact could reasonably infer that McCormack's threats regarding his arrest and the towing of his vehicle indicate an intent to influence the troopers' official actions. Therefore, we hold there is sufficient evidence of McCormack's intent to influence and affirm his intimidating a public servant conviction.

## CONCLUSION

The trial court did not abuse its discretion in denying McCormack's motion to continue. Also, because McCormack did not inform his counsel of any mental health issues or raise the possibility of a pathological intoxication defense with counsel until the day before trial, McCormack's counsel did not render ineffective assistance. Finally, sufficient evidence exists for each of McCormack's convictions challenged on appeal. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, C.J.

Che, J.